It is not proof of any fact in the case, but purely collateral, affecting the credibility of the witness. We cannot say the error 'in the exclusion of the testimony was immaterial. The case was close, and the testimony of Ann Hawley was very important, and credence was not given to her story by the referee. If the plaintiff could have satisfactorily shown that she had knowledge of this assignment long before the death of John B. Hawley, it would have taken the sting out of the impeaching testimony, so far as it tended to show a lack of knowledge in her.

The judgment is reversed, and a new trial ordered, with costs to the appellant to abide the event. All concur.

---

In re LAWRENCE'S WILL.

(Supreme Court, Appellate Division, First Department. February 9, 1900.)

WILLS—TESTAMENTARY CAPACITY—EVIDENCE.

The opinion of experts that a testator was probably insane when he executed his will, deduced from the fact that he became so within three months after such execution, and expressing only their opinion as to a possibility, is insufficient to show incapacity, where they are contradicted by all the other evidence relating to his condition prior to the execution of his will, and up to the time he sailed for Europe, where he subsequently became insane.

Appeal from surrogate's court.

Proceedings for the probate of the will of De Witt C. Lawrence, in which the testator's capacity was contested. From a decree admitting the will to probate (59 N. Y. Supp. 174), contestants appeal. Affirmed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

Henry W. Taft, for appellants.
John Notman, for proponent Louisa Lawrence.
David McClure, for proponent Farmers' Loan & Trust Co.
Henry D. Sedgwick, Jr., guardian ad litem for Taber infants.
Lucien Oudin, guardian ad litem for Charles C. Lawrence, an infant.

INGRAHAM, J. The appellants question in this proceeding the testamentary capacity of the testator, and upon this appeal seek to reverse the decree of the surrogate admitting the will of the testator to probate, solely upon the ground that upon the evidence his testamentary capacity was not established. In determining this question, we are mindful of section 2586 of the Code of Procedure, which provides that, where an appeal is taken upon the facts, the appellate court has the same power to decide the question of fact which the surrogate had; and we have considered the question of fact as to such testamentary capacity upon the evidence, in view of the duty imposed upon us by this provision.

De Witt C. Lawrence, the testator, at the time of the execution of the will, was about 57 years of age. He had been for many years

in active business as a member of a banking house in the city of
New York, a member of the New York Stock Exchange, and a repre-
sentative of his firm upon the floor of the exchange. During the
troublesome time which followed the year 1873, the testator seems
to have been left in charge of the business of his firm, his brother
and partner being in Europe at the time. Upon the return of his
brother from Europe, he resumed his duty as the representative of
his firm in the stock exchange, and continued in active business until
the year 1886. In that year two sons of the testator's brother were
taken into the firm. The testator continued as a general partner,
but he seems to have abandoned active participation in the business
of the firm; and, while retaining his interest and a share of the
profits, he left the active management of the business to his partners.
The testator was married early in life, and had six children,—one
son and five daughters. His first wife died about 1882, and at the
time of the execution of the will two of the daughters were minors,
two daughters were married, and the oldest daughter was an invalid.
In the spring of 1887 the testator desired to remarry. His proposals
were at first rejected, but subsequently, and in May, it was arranged
that, as his proposed wife was about to visit Geneva, Switzerland,
where her family resided, she should consult them, and, if their opin-
ion was favorable, upon her return to New York, in the fall, the mar-
riage should take place. This being the situation, the testator went
to his legal adviser, Mr. William Allen Butler, and gave instruc-
tions as to the preparation of the will in question, in consequence
of which a will was prepared by Mr. Butler, and duly executed by
the testator. After its execution it was shown to the testator's in-
tended wife, and, upon her asking him whether the provision that
was made for her was fair to his children, he replied that it was, as
he had a large income from his business, and his children had other
means from which they would ultimately receive a suitable provision
for their support. Subsequently the intended wife sailed for Europe,
and went immediately to Geneva. After her departure the testator
sailed for Europe, arriving at Geneva about June 28, and the parties
were married at Geneva on July 21, 1887. The testator and his
wife left Geneva for a short trip, returning to Geneva about the
26th or 27th of July. Upon his return to Geneva the testator did not
appear well, and several days after consulted a physician there, who
seems to have had some apprehension about his mental condition,
although such apprehension does not appear to have been communi-
cated to the testator or his wife. Arrangements were then made for
them to return to New York, and they appear to have left Geneva
on August 10th for Paris, expecting to sail for America on Saturday,
August 13th. They arrived in Paris on Thursday, intending to re-
main there until Saturday, but on Friday night the testator appears
to have become insane. His wife, acting on professional advice,
caused him to be taken to an insane asylum, where he remained un-
til he was brought to this country in the following October, when
he was examined by physicians, and found to be suffering from melan-
cholia, and was taken to an asylum at Middletown, Conn., where
he remained until his death, on April 12, 1897.

There is no question that the deceased was insane when he arrived in New York, in October, 1887, and so continued until his death. The evidence disclosed that the testator, up to the time that he sailed for Europe, had a large circle of friends, with whom he was in the habit of associating; that he attended to his ordinary business with intelligence and success, and presided over and managed his household affairs. His relations with his children seem to have been affectionate, and, considering his means, he seems to have made liberal provision for their support. Neither his children nor his relatives and friends testified to any facts before his departure for Europe which would seriously tend to show any impairment of his reason; and while the testator's brother and his son-in-law have testified in opposition to the probate of the will, and detailed certain facts from which some conclusion of mental impairment is sought to be drawn, considering the time over which these detailed incidents were spread, they fail to justify even a suspicion of such a mental condition as would constitute testamentary incapacity. It is quite apparent that such incidents could be collected from the life of any man with a nervous temperament, not in robust health, and who either had, or imagined he had, some physical disorders. But during all this time the testator managed his business and household affairs, lived his ordinary life intelligently, and without any one expressing a doubt as to his sanity. The opinion of the eminent experts who examined him upon his return to New York in October, and then pronounced him insane, is undoubtedly correct,—that the disease from which the testator was suffering in October was progressive, and required some months to develop, and that from four to six months prior to their examination in October he had been suffering from the malady which finally ended in reducing him to the condition in which he was found at the time of the examination. But we agree with the surrogate that at the time of the execution of the will there was no evidence to show that he had not then testamentary capacity.

The rule formulated in Delafield v. Parish, 25 N. Y. 29, has been since that time followed in this state. It is there said:

"We have held that it is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were or should or might have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must, in the language of the cases, have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do these things is, within the meaning and intent of the statute of wills, a person of sound mind and memory, and is competent to dispose of his estate by will."

The question, therefore, is not whether the testator at the time of the execution of this will was suffering from disease from which he became insane in October, but whether at the date of the execution of the will the disease had so far progressed that he had not sufficient memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious

relations to each other, and be able to form some rational judgment in relation to them, and whether he did intelligently determine to make the testamentary disposition in question, and execute that intention.

There is another phase of mental disease, when a person having a strong delusion makes a will controlled by such a delusion, or so under its influence that the testamentary disposition of his property is affected thereby, which it is not necessary to consider in this case, as there is no evidence that the testator had any delusion as to his property, or that could affect its disposition. It is quite apparent that if this testator had died on August 11th, the date of his arrival in Paris, there would have been no suspicion that he lacked testamentary capacity. Up to that time his memory appears to have been entirely unimpaired, and his brother, who was called as a witness for the contestants, in speaking of the date of the execution of the will, testified:

"No doubt, he knew of the amount of his property at that time. He had a very acute memory, and could state figures and circumstances with great precision. His memory never failed."

And the testimony of Mr. Butler in relation to the instructions given by the testator for preparing the will shows conclusively that the testator had at the time a clear appreciation of the situation, and understood exactly what disposition he wished to make of his property. He clearly understood and appreciated the amount of his property, and appreciated the fact that his children would be entitled to a considerable amount of the property over which he had no control. He appreciated the fact that during his life he would be able to provide a suitable support for his children from his income, and he, no doubt, anticipated that before his death his children would inherit the amount to which they would be entitled upon the death of their grandmother; and, considering this quite natural presumption, his desire to make a suitable provision for the woman whom he wished to make his wife, and any children that she should have as a consequence of the contemplated marriage, was not at all unreasonable. Counsel for the contestants frankly stated upon the argument that the will itself was not so unjust as to afford a presumption that it was the result of an insane mind, prompted by delusions, or the undue influence of others; and certainly, considering the circumstances of the parties, and the provision that the testator made for his children, it cannot be said that the provision made for his wife and the children of the proposed marriage was either unreasonable, or indicated any unnatural disposition towards his children. We have therefore only the testimony of the experts from which testamentary incapacity can be inferred. The substance of their testimony is that the testator on October 16, 1897, was in a condition of acute melancholia, with delusions; that the onset of that disease had been of a slow and steady character; and that the condition that he was in at that time was the culmination of a progressive disease, which had continued from four to six months. Dr. Starr was asked:

"In your opinion, was his mental condition such that he was at that date (May 9, 1887) capable of making a rational selection among the members of his

family, as the objects of his bounty?  A. I don't think any one could say definitely 'Yes' or 'No' to that question, but my impression would be, 'No.'  A man does not become insane on a certain date.  He becomes gradually insane, and the probability as to the degree of that insanity depends upon the length of time of the onset.  The probability is that at that time his mind was deranged."

### On cross-examination he was asked:

"Nevertheless, there is a possibility that it might have been in such a condition that he might have made such a disposition which was rational and proper? A. There is a possibility."

### He further testified:

That the time of the onset of such a disease was never to be determined absolutely in a case like that.  There was usually a slow onset of the disease, extending through several months.  "My testimony was that he was insane at the time I examined him, but that it was a matter of opinion whether he was insane at the time that the will was made.  I did not swear that he was insane at the time the will was made.  My opinion is that in all probability he was mentally affected at the time he made his will."

And then, when asked whether, in his opinion, it was the marriage which caused his insanity, the witness answered:

"I think it is very difficult to state.  I think the chances are that this man was a very nervous man, approaching insanity, and that marriage may have been just the exciting thing that sent him off."

Dr. Kinney, the physician in charge of the asylum in which the testator was detained down to the time of his death, was asked whether on May 9, 1887, he was capable of making a rational selection among the members of his family as the objects of his bounty by his will.  He answered:

"He might have been, and he might not.  It would depend upon the mood in which he was at the time of the making of the will.  The tendency at that time was probably that of a weakened will power and irritability, and an unreasonableness that would influence his action."

Giving full weight to this testimony, it is quite apparent that it falls far short of justifying a finding that at the time of the execution of the will the testator had not testamentary capacity.  At most, it expresses the opinion of the witnesses as to a possibility, and that is contradicted by all the evidence as to the testator's intelligence, self-control, and mental attitude prior to his sailing for Europe in June subsequent to the execution of the will.

Dr. Allen, who had been the testator's medical adviser up to about June, 1886,—less than a year prior to the execution of the will,—was also examined.  He testified that the testator had been worried about his wife's illness for two or three years prior to her death, in 1882; that he prescribed for the testator after his wife's death; that the testator spoke to the witness frequently about his business, and his troubles in his co-partnership affairs, and with his brothers, his brothers' children, and his own children; that he was fearful that he had some serious disease of his heart that would terminate his life, and was also fearful that he had other diseases, of which the doctor could find no indications.  But during all this time it does not seem that the witness had any suspicion that the testator was mentally diseased.  The testator's brother testified that he asked Dr. Allen if he thought there was any danger of softening of the brain,

to which the doctor replied, "No;" that he did not think it was anything more than a nervous trouble. Dr. Douglas was also called as a witness. He testified that the testator consulted him professionally on the 14th of June, four days before sailing for Europe; that his manner and appearance, his conversation and conduct, were rational; that his conversation was intelligent; and that the witness never observed any evidence of an irrational character about the testator. That was after the will was made. From the testimony of those who saw the testator prior to his departure for Europe, including the medical men, it appeared that his conduct was rational, and that he had a good memory, and apparently a perfect grasp of the situation. He desired very much to be married, but that certainly is not evidence of insanity or lack of testamentary capacity; and his wish to make a proper provision for his intended wife, and the provision that he made for her, under the circumstances, were but reasonable. From the whole evidence, it seems to us that at the time the testator made this will he was able to form an intelligent and rational judgment, and that the will in question was the result of this intelligent, rational judgment, and carried out his intelligent and rational desire.

It follows that the decree of the surrogate admitting the will to probate must be affirmed, with costs. All concur.