## In re RICHARDSON'S WILL.

(Supreme Court, Appellate Division, First Department. May 25, 1900.)

1. WILLS—EXECUTION—EVIDENCE—KNOWLEDGE OF CONTENTS—PUBLICATION—ATTESTATION—PROBATE.

Where the execution of a will was proved by three disinterested witnesses, whose integrity was not questioned, and the uncontradicted evidence showed that testator read or attempted to read the will, but because of difficulty with his glasses requested one of the witnesses to read it to him, which was done, and that testator thereafter signed it, declared it to be his last will, and requested the witnesses to sign it, such will was sufficiently shown to have been executed by the testator to entitle it to probate.

2. SAME—TESTAMENTARY CAPACITY—HEART DISEASE—MENTAL DISEASE—DELUSIONS.

Testator had full testamentary capacity until about a month before execution of a will, when he was attacked by heart disease, but visited his office daily for 10 days, after which he was confined to the house. The physician who attended him testified that he was perfectly rational till his death, and there was no indication of mental disease. After executing the will he transacted important business, for several weeks saw his friends daily, had frequent interviews with his brokers and legal advisers, and executed important instruments relating to his property, and, though seeming sometimes dull and stupid and to have delusions, none of such delu-

sions concerned his property or its disposition. *Held* to show sufficient testamentary capacity to entitle the will to probate.

**3. SAME—RESTRAINT—UNDUE INFLUENCE.**

Testator's wife, who attended him during his illness, was anxious that provision be made for her after his death, and he had considered such provision, and an attempt to give her a check had been frustrated. A disinterested witness told him he should provide for her, and he said he would take care of her, and several times shortly before execution of his will said he had been urged to make a will. Testator was a man of great wealth, and ample provision was made for his children. *Held*, that it was not error to find that a reasonable provision for his wife and a bequest to a church and its pastor were made without restraint or undue influence.

Appeal from surrogate's court, New York county.

Petition by Emma J. Richardson for the probate of the last will and testament of Joseph Richardson, deceased. From a decree admitting the will to probate, Dellaripha G. Richardson and other contestants appeal. Affirmed.

Argued before PATTERSON, P. J., and HATCH, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

Wheeler H. Peckham and Howard A. Taylor, for appellants.

Perry D. Trafford, special guardian, for infant appellant.

Delancey Nicoll and Thomas Darlington, for respondent Emma J. Richardson.

Edward S. Clinch, for respondent Harry M. Warren.

INGRAHAM, J. The will offered for probate was executed on April 24, 1897, and the appellants objected to its probate upon the ground that the instrument was not the last will and testament of the decedent; that the execution thereof was unduly influenced, and was not his free, unconstrained, or voluntary act; and that the testator had not testamentary capacity. The surrogate overruled the objections of the appellants, and admitted the will to probate, and the appellants upon this appeal ask us to reverse the decree of the surrogate, and send the question to be tried by a jury, upon the ground "that the facts in this proceeding are so doubtful that justice will be promoted by a retrial before a jury," and insist that, as the jurisdiction of this court is not only appellate, but original, and as under sections 2576 and 2586 of the Code of Civil Procedure it is the duty of the court to consider the testimony upon which the surrogate acted, and to decide the question irrespective of his determination, if, upon a consideration of the whole testimony, the result reached by the court below was not entirely satisfactory, and upon the evidence is not free from doubt, the case should be considered by a jury.

In view of this contention of the appellants, we have carefully considered the testimony presented by the record to determine whether the case as made would justify us in saying that upon the evidence the correctness of the result reached by the court below was so much in doubt as to justify us in directing that the question should be submitted to a jury. We are satisfied that there is no serious doubt upon the questions determined by the court below. The very care-

ful analysis of the evidence by the surrogate renders it unnecessary
to again review the testimony. A short statement of the facts estab-
lished will be sufficient to show that he is justified in the conclusion
at which he arrived.

The testator was married in the year 1881, and his wife survives
him. He was then a widower with two children, the issue of a for-
mer marriage. At the time of his second marriage he and his in-
tended wife seem to have arrived at an agreement that neither should
claim any interest in the estate of the other. There is evidence,
however, that after the marriage the testator did obtain some of the
property which belonged to his wife, as the house in which they
lived had been her property, but had been conveyed to him, and by
him conveyed to his daughter. As late as 1894, the testator made a
will in which his wife was not mentioned, and in which all of his
property was left to his two children by the former marriage. The
testator had accumulated a large amount of property, and down to
the 20th of March, 1897, it is conceded that he attended to his busi-
ness, and had full testamentary capacity. On the 20th of March he
seems to have had an attack of heart disease. He continued, how-
ever, to make daily visits to his office until March 31st, when he had
a severe attack of the complaint from which he was suffering, and
from that time was confined to his house, except on two or three
occasions, when he seems to have taken a ride, and on two days in
the latter part of May, going to the office of his broker, with whom
he transacted business, and on one of the days attending a meeting
of the stockholders of the Pacific Mail Steamship Company, in which
corporation he was largely interested. After the 31st of March he
was cared for by nurses and by his wife, and on the 24th of April
he executed the will in question. The due execution of this will is
proved by three witnesses, who appear to have been entirely disin-
terested. Two of them had but a very slight acquaintance with
the testator, and were requested to attend and act as witnesses to
the will by a clergyman, one of the respondents, who received a legacy
of $50,000, and the third witness was a nurse who had the care of
the testator. There is not the slightest attempt made to impeach
the integrity of these witnesses to the will, and the circumstances at-
tending its execution are not such as to indicate that any advantage
was taken of the testator, or that he did not understand what he was
doing. The evidence is uncontradicted that the testator read or at-
tempted to read the will after it had been copied out, but that, having
some difficulty with his glasses, he requested the nurse who was at-
tending him to read the will to him, which the nurse did, and there-
after the testator signed it, declared it to be his last will, and re-
quested the witnesses to sign it.

The execution of the will being thus proved, it should be admit-
ted to probate, unless there is evidence to sustain a finding that
there was a lack of testamentary capacity of the testator, or that
there was undue influence. There can be no doubt as to the tes-
tamentary capacity. The complaint with which the testator was
suffering was not one that tended to weaken the mental power or
produce a disease of the brain. No physician was called who testi-

fied that there was any indication of mental disease. The physician who attended the testator during his last illness, seeing him several times a day from the 31st of March until his death in June, testified that during all this time he was perfectly rational. The case of the contestants depends upon the testimony of visitors who called to see the testator during the period between the 31st of March and the time of his death, and their testimony relates to various instances when the testator seemed dull and stupid, and to declarations from which it appeared that he had delusions; but none of these delusions appear to have been as to his property or the disposition that should be made of it. None of them related to his children or to his wife, and they may be put down as the vagaries of an old man suddenly stricken by sickness, compelled to change all the habits of his life, and confined to his house. Yet during all this time, down to a day or two before his death, he saw his friends and acquaintances daily, having almost daily interviews with a representative of the firm of brokers who acted for him, having interviews with his legal advisers, and executing instruments of importance relating to his property, and this continued for several weeks after the execution of this will. We think there can be no real doubt that during this time the testator knew perfectly well what he was about; that he had sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were or might have been the objects of his bounty, and the scope and bearing of the provisions of his will. "He must," in the language of the cases, "have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive, at least, their obvious relations to each other, and be able to form some rational judgment in relation to them." Delafield v. Parish, 25 N. Y. 29; In re Lawrence, 48 App. Div. 83, 62 N. Y. Supp. 673. The whole evidence shows that the testator had testamentary capacity as thus defined at the time of the execution of this will.

The execution of the will, and that when he executed it he understood what he was doing, was proved, and the evidence entirely fails to show undue influence. He was attended by his wife during his illness, and she was anxious that some provision should be made for her after the testator's death; but it cannot be said to be evidence of undue influence that a man of great wealth, who had amply provided for his children, should make a reasonable provision for his wife, or that the wife should desire to have such provision made for her; and, in view of the wealth of the testator, the bequest to the church and to the clergyman was not at all unreasonable. The will itself, with the exception of these two legacies, disposes of his property as it would be disposed of by the statute of distribution in the event of his dying intestate. The evidence also disclosed that for some time prior to the execution of the will the testator had been considering the question as to what provision should be made for his wife after his death. He made an attempt to provide for her by giving her a check for $50,000, which was

frustrated by the refusal of his brokers to honor his check for that amount; and there was evidence tending to show that this was prevented by the action of his children, between whom and the wife it is quite evident that there was considerable antagonism. The attempt to make this provision for his wife having failed, he accomplished the purpose by making this will. That he had been considering this question for several days, and understood the necessity of making some provision for his wife, appears from the testimony of Mr. Ambrose, a witness called by the contestants, who was a friend of the deceased, had been connected with him in many business transactions, and who seems to have been entirely disinterested. He testified that before the execution of the will he called on the deceased, and had an interview with him, at which Mrs. Richardson was present; that Mrs. Richardson said that Mr. Richardson had not done anything for her up to that time, and to that Mr. Richardson made no reply; that he had another interview with Mr. Richardson some time between the 17th of April and the 1st of May; that when the witness went in he (the deceased) "called me over to him, and said that they had been urging him to make a will"; that the deceased spoke to the witness more than once about the matter; that the witness did not urge him to make a will, but did tell him that he should make an immediate and ample provision for Mrs. Richardson; that the deceased said he had done something for her in the past, and would take care of her, but that he did not indicate how he would do it. When asked how many times the deceased spoke about those who had been urging him to make a will, the witness said: "I don't think he said it at all after the 17th or 18th of April. He might have said it a great many times during the six or eight days immediately succeeding April 9th." That he said it a great many times "between the 10th and 17th." It thus appears that the question as to the provision to be made for the wife, and whether it should be made by a will, was discussed by the decedent, and nothing appears to show that he did not understand the question under discussion. He was advised by his friend that he should make a provision for his wife, and stated that he would take care of her, but did not indicate how he would do it. Certainly, nothing appears in this interview that would show that the deceased was under any delusion, or that there was any lack of capacity to understand the situation of his property, and the nature of the provision that he should make for his wife, and an intention was expressed to make some provision for her. There does not seem to have been at the time of that interview any one present who was exercising any improper influence upon him, and there would seem to be no doubt but that the deceased considered for several days the provision that he should make for his wife, and that he executed this will to carry out a deliberate and intelligently formed intention.

A careful consideration has thus brought us to the conclusion that the decree of the surrogate admitting the will to probate was required by the evidence, and that we would not be justified in reversing his decree. The decree appealed from is therefore affirmed. with costs. All concur.