(80 Misc. Rep. 619.)

### In re BROWNING'S WILL.

(Surrogate's Court, New York County. May, 1913.)

1. WILLS (§ 50*)—"TESTAMENTARY CAPACITY."

To constitute "testamentary capacity," it is both essential and sufficient that the testator have sufficient capacity to comprehend perfectly the condition of his property, his relation to the persons who are the objects of his bounty, and the scope and bearing of the provisions of his will, and that he have sufficient active memory to collect in his mind, without prompting, the particulars of the business to be transacted, and hold them in mind long enough to perceive their obvious relations to each other, and form some rational judgment in relation to them.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 96–100; Dec. Dig. § 50.*

For other definitions, see Words and Phrases, vol. 8, pp. 6929–6931.]

2. WILLS (§ 55*)—TESTAMENTARY CAPACITY—SUFFICIENCY OF EVIDENCE.

Evidence in proceedings on the probate of a will held sufficient to establish testatrix's testamentary capacity at the time of its execution, though it appeared that about ten years thereafter she became hopelessly deranged, especially where the will was fair and just, and indicated that testatrix was guided by gratitude and common sense in the disposition of her property.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

Proceeding upon the probate of the will of Anna Maria Browning, deceased, wherein Barbara Browning was proponent, and Joseph G. Browning and others were contestants. Will admitted to probate.

Richard Dudensing, for proponents.

Hauff & Warland, of New York City, for contestants Joseph G. Browning, Jr., Isaac V. Browning, Minnie A. Feldman, and Jane Pitt Gross.

Clinton & Olsen, for Mabel M. Kleinstuber.

Henry Herz, of New York City, special guardian of contestants Lucille Browning, William B. Higgins, Samuel K. Higgins, Jr., Harold H. Higgins, and Harriet M. Higgins.

Edgar Pitske, of New York City, for Annie M. Browning.

COHALAN, S. The paper offered for probate as the last will and testament of the decedent was executed October 24, 1897. The estate consists of personal property. The next of kin are a brother, Joseph G. Browning, two sisters, Barbara Browning and Jane Gross, and many nieces and nephews who are children of deceased brothers and sisters of the decedent. The will bequeaths a life estate to two aunts of decedent, Sarah and Anna Browning, if they survive the testatrix,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

with a remainder to "such of my beloved sisters, Barbara Browning and Jane Anna Pitt Browning (Jane Gross), who shall then be unmarried, never having been married, absolutely and forever." If both of the two sisters named had married, the property was to be divided equally among all of the sisters living at the death of the testatrix. Sarah Browning, one of the aunts named in the will, predeceased the testatrix, and the aunt named Anna Browning survived the testatrix. Barbara is the only sister of the decedent who remained unmarried, and under the terms of the will she has a remainder interest in the estate of the testatrix limited on a life estate to the surviving aunt. Barbara and her sister Jane are named in the will as executrices.

The probate of the paper propounded is contested by 11 nephews and nieces of the testatrix and by Joseph G. Browning and Jane Gross, a brother and sister of the testatrix. The proponent of the will is Barbara Browning, one of the two beneficiaries. Objections on the usual grounds were filed on behalf of all of the next of kin, except Barbara Browning. At the trial the factum of the will was established, and the contestants produced many witnesses to show testamentary incapacity and the exercise of undue influence. The charge of undue influence is made against Barbara Browning, the sister of the testatrix, and the chief beneficiary of the will. The decedent was one of seven children, whose mother died while the children were young. The father died in 1883, when the testatrix was about 20 years of age. After the mother's death the children were brought up by the two aunts—sisters of the father. The father lost his own and some of the aunts' money in investments, and it seems that he was very grateful to the two aunts for their unselfish devotion to him and to his children. This feeling of gratitude seems to have been shared by the testatrix and by her sister Barbara Browning, the proponent. In the course of time the brothers and most of the sisters married, while the testatrix and Barbara continued unmarried. Jane was married some years after the will was executed. Each of the girls had a small income from some real estate that they inherited from a grandfather, and this income enabled them to support themselves and the two old aunts with whom they lived prior to 1897.

The testatrix began to exhibit peculiarities and eccentricities when she was about 18 years of age. The witnesses for the contestants testified to many acts of the testatrix extending over a period of 10 or 15 years prior to the execution of the will, and these acts were characterized by the witnesses as irrational. The testatrix was about 34 years of age when the will was executed in 1897. By this time her eccentricities had become so pronounced and her condition of health was such that a family conference of the brothers and sisters was held in September, 1897, when it was decided to send her to a private sanitarium. Accordingly, on October 25, 1897, she was admitted to "Interpines," a private institution at Goshen, N. Y. On October 21, 1897, testatrix executed a power of attorney to her sister Barbara, and she executed her will at the home of a friend the evening before she went to the sanitarium. At this institution she could not be legally re-

strained, as she had not been legally committed there, and in January, 1898, accompanied by a nurse, she came to New York City, against the wishes of the superintendent. A day or two afterwards her brother Joseph and her sister Barbara had her legally adjudged insane before the special surrogate of Orange county, and on January 11, 1898, she was ordered committed to the Middletown State Hospital for the Insane. She remained there for about seven years, and was "discharged unimproved" September 21, 1904.

Her hospital record while she was at the Middletown State Hospital is in evidence, and Dr. Ashley, the superintendent of that institution, has stated what he observed of the acts and condition of the testatrix while she was under his charge, and has stated his opinion of her mental condition based upon that observation. Dr. Ashley stated that in his opinion testatrix suffered from a paranoiac condition; that she was in an "exceedingly unstable emotional condition, manifested by frequent outbursts of temper"; that she was "pleasant at one moment and angry the next"; that she believed she was being "abused, neglected, and ill treated by the physicians"; that she was "so disturbed, so fault finding and so troublesome" that he finally asked her relatives to take her away. After her discharge from the Middletown State Hospital she was in a private institution at Caldwell, N. J., for a short time, and on December 22, 1904, she was admitted to the Central Islip State Hospital for the Insane where she died in July, 1911. She was absolutely demented during the last three or four years of her life, and died hopelessly insane. The cause of death was acute dilatation of the heart.

Such in outline is the sad history of this unfortunate woman. There is no evidence in this case of undue influence, and there does not seem to be any foundation in fact, so far as appears from the testimony taken before me, for the allegation or suggestion that Barbara procured the making of the will by any trick or device. There is nothing in the record to show that Barbara was anything but a faithful and affectionate sister, and it would seem from the letters that the testatrix wrote to her while she was in the hospital at Middletown that Barbara was her favorite and the one upon whom the testatrix relied for advice and attention.

[1] The only real question in this case is the question of mental capacity. The issue narrows down to whether at the very time of the execution of this will testatrix was possessed of testamentary capacity. What is testamentary capacity has been well settled by the courts of this state. The rule laid down in Delafield v. Parish, 25 N. Y. 9, has been quoted many times with approval by the courts of this state, and is reiterated in Matter of Lawrence, 48 App. Div. 83, 62 N. Y. Supp. 673, a case somewhat analogous to the present one. The definition is as follows:

"It is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or should, or might have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must, in the language of the cases, have sufficient active memory to collect in his mind, without prompting, the

particulars or elements of the business to be transacted, and. to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them. A testator who has sufficient mental power to do these things is within the meaning and intent of the statute of wills a person of sound. mind and· memory, and is competent to dispose of his estate by will."

From this definition it is apparent that a person may have sufficient testamentary capacity to make a valid will if the will be a simple one and yet not have sufficient capacity to make certain kinds of contracts. The sole question here is whether or not in the execution of her will Anna Maria Browning had sufficient mental capacity to remember the brothers, sisters, and·relatives who might be sufficiently near and dear to her to be expected to be the objects of her bounty, whether she could realize the fact that she owned an interest in a piece of real estate worth·about $8,000 and appreciate the value of that amount of money, and whether she could without prompting collect these ideas in her mind for a space of time long enough to enable her to form a rational judgment regarding them and make that judgment effective. by the execution of a will, making an intelligent and deliberate disposition of that property.

[2] Dr. Maurice Ashley, superintendent of the Middletown State Hospital for the Insane, whose eminent position as a specialist on nervous and mental disorders is unquestioned, and who had this woman under observation for about seven years, was a witness for the contestants. On cross-examination he testified that he thought the testatrix could have remembered the members of her family in October,. 1897; that she could have remembered her family history; that she could have remembered the family relations that existed between the members of all her family; that she could have remembered that at one time they had been quite wealthy, and that later they lost their money or a greater part of it. He further testified as follows:

"Q. Do you think she would know if she made a last will and testament in which she gave the income for life to her two old aunts and the remain-. der of that property to her unmarried sisters, do you think she could distinguish and understand that at that time? A. Yes; I think she could understand it."

Dr. Seward, who had charge of testatrix at "Interpines," where she was under treatment from the day after she made the will until January, 1898, was another one of contestants' experts and testified that testatrix had property delusions and delusions of persecution. He: was asked:

"Q. Did she ever state to you the amount of her property? A. No; not. to my recollection."

If testatrix had never told the doctor the real or imaginary amount· of her property, he could not be expected to know whether or not she· had property delusions in this sense of the term. Regarding her condition when she was admitted to his institution, the day after the will was executed, the doctor testified as follows:

"Q. Don't you know when she came there that she had very many rational moments? A. She had moments of apparent rationality when she was not actuated by her delusions.

"Q. And up to that time she had sufficient understanding and mind that she could know what she wanted to do with her property? A. Possibly so; I could not say.

"Q. Did she know the number of her relatives and their relationship to her? A. Yes.

"Q. And the nature and extent of her property? A. Yes."

It is to be noted that there are in evidence several letters written by the testatrix to her sister Barbara from five to seven years after the will was executed, and while she was confined in the State Hospital at Middletown, which indicate clearly that at the time of writing these letters the testatrix was perfectly rational. In these letters she referred to many of her relatives; to gifts that had been sent her; to her unfortunate situation; to many books she had read; and to many incidents that had occurred in the hospital. In these letters she mentions the two old aunts, and says that her father asked her to be good to them; she is particularly affectionate in her reference to her sister Barbara, and she deals with the wide range of subjects mentioned in the letters in an ordinary rational manner.

The contestants rely upon the proofs of the eccentric conduct of the decedent from the time that she was about 18 years of age till she was sent away in 1897, at the age of about 35 years. It appears that during this period she was prone to exaggerate her bodily ailments; took more medicine than she really needed and consulted physicians when there was no necessity for it; spent a great deal of time in dressing; threatened homicide and suicide; went to a reception at one time in some old clothes; became easily excited and angry; was morose and melancholy at times; and did various other things that were characterized by the lay witnesses as irrational. These acts do not create any presumption as to her mental capacity in October, 1897, for she might have done all these things, and yet have been perfectly competent to execute a valid will.

The occurrences immediately preceding and surrounding the execution of the will establish the fact very clearly to my mind that the testatrix knew what she was doing, and was of sound and disposing mind and memory when she executed the will. She had given full and complete instructions to the lawyer several days before the will was executed. He has testified clearly and explicitly to his conversations with the testatrix at the time he received his instructions from her, and when she executed the will. I think his testimony is to be believed, as is also that of Marie Lotze, the only living witness to the will. Their testimony negatives the contention that the testatrix was under any delusions when she made her will.

It is to be noted, also, that it was not until about 10 years after the execution of the will that the mind of the decedent became hopelessly deranged. She had no organic disease of the brain, and consequently this is not one of that class of cases where a person at the time of making a will suffered from a progressive organic disease that

did not make itself apparent until some time after the execution of the will.

It must not be overlooked that the will that is contested so strenuously by most of the relatives is, under the circumstances, a very natural will. The unmarried girls had been keeping up the home, and supporting the two aunts who had brought them up. The other brothers and sisters had married, and had their own homes. The provisions of the will itself show that it was not the result of a delusion. If testatrix had been under a delusion suggested by Barbara, or if the will were the result of undue influence, it seems to me that the provisions of the instrument would have been different. For Barbara would have seen to it that she would not have to wait until the termination of one or possibly two life estates to come into possession of the property, and the will would not have provided for a division of the remainder interest with the sister Jane if Jane remained unmarried, or with all the sisters in case both Barbara and Jane had married.

The will is very fair and just, and would indicate that the testatrix was guided by gratitude and common sense in the disposition of her property. In my opinion the evidence falls far short of proving that the testatrix was controlled by any delusion in the making of her last will and testament. I am satisfied that she was of sound and disposing mind and memory, and not under restraint in the execution of the paper offered herein for probate.

The paper propounded as the last will and testament of Anna Maria Browning will be admitted to probate. Submit decision and decree and tax costs on notice.

Decreed accordingly.