## IN RE SWAN'S ESTATE

No. 2881.   Decided February 8, 1918.   (170 Pac. 452.)

1. WILLS—TESTAMENTARY CAPACITY—EVIDENCE—REVIEW. Though a testator was eighty-three years old, suffering with hardening of the arteries and a disease of the kidneys, and his physical health had been failing for some time, and his mind was more or less affected, and at times he had spells of unconsciousness lasting several hours at a time, the testimony of the subscribing witnesses that his health and mind were good at the time the will was executed, and he knew what he was doing, and was in sound mind, made a prima facie case of mental capacity, and was such substantial evidence in support of the trial court's finding of mental capacity as precluded

the Supreme Court from disturbing the judgment, however strong the evidence of testamentary incapacity.[1] (Page 421.)

2. EVIDENCE—OPINION EVIDENCE—MENTAL CAPACITY—COMPETENCY AND WEIGHT OF EVIDENCE. Laymen who speak from facts within their knowledge are competent to testify on the question of the mental capacity of a testator, and their testimony can stand and may be considered by the court, though contradicted by the testimony of medical experts, that the testator was suffering from senile dementia, and that such disease deprives a person of testamentary capacity. (Page 425.)

McCARTY, J., dissenting.

Appeal from District Court of Salt Lake County, Third District; *Hon. Geo. G. Armstrong,* Judge.

Proceeding to probate will of Edward D. Swan, deceased.

From a judgment sustaining the will, the contestant appeals.

AFFIRMED.

*Charles Baldwin* and *Dey, Hoppaugh & Fabian* for appellant.

*Snyder & Snyder* for respondent.

THURMAN, J.

This case was submitted at a former term of this court, and on November 17, 1916, the court, by a majority, filed an opinion in the case reversing the judgment of the trial court. A petition for a rehearing was filed by the respondent. Upon a consideration thereof the court entertained some doubt as to the correctness of its conclusions and granted a rehearing. Since then the membership of the court has been increased by legislative enactment from three members to five, and the case has again been argued by respective counsel at the present

---

[1] *Miller* v. *Livingstone,* 31 Utah, 417-439, 88 Pac. 338.

term of this court. Two opinions were filed at the former hearing—a majority opinion denying the motion to dismiss the appeal (as to which the court was unanimous), and one reversing the judgment of the trial court, from which a minority dissented and filed a minority opinion. After reargument during the present term we have become convinced that the views expressed, in substance at least, in the minority opinion, above referred to, affirming the judgment should, with some modifications, be adopted as the decision of this court; and to avoid confusion the opinions referred to will not be published, but this opinion will stand and be published as the decision of the cause. The writer feels at liberty, in attempting to express the views of the court, to use literally, or in substance, as he may see fit, such portions of the minority opinion referred to as may be necessary to elucidate the matters in controversy in this proceeding. In view of the conclusion at which the court has arrived respondent's motion to dismiss the appeal, which was wholly without merit, will be passed without further consideration.

On the 30th day of January, 1915, Ulysses Grant Swan filed his petition pursuant to our statute in the probate division of the district court of Salt Lake County, in which he, in substance, alleged that on the 14th day of January, 1915, the father of petitioner, one Edward D. Swan, died testate; that the deceased was a resident of Salt Lake County, Utah, and that he left an estate in said county consisting of real and personal property; that the deceased, on the 2d day of March, 1914, made and published his last will and testament, a copy of which was attached to and made a part of the petition. The names, ages, and places of residence of the several devisees and legatees under the will were also stated. It was also alleged that the deceased left surviving him one Maude A. Blackford, a granddaughter of the deceased, and that she was intentionally omitted from said will as a devisee or legatee because the deceased had in his lifetime given her all the property he intended to bestow upon her. Other necessary allegations are contained in the petition which it is not necessary to repeat here. The petitioner prayed that the will be admitted to probate, etc.

Maude A. Blackford aforesaid, in due time, filed objections to the admission of said will to probate. The material parts of the objections are as follows:

"That this contestant is a granddaughter of said decedent and one of his heirs at law and entitled to share in the distribution of his estate, if said deceased died intestate, but was not mentioned in said will. That at the time when the said decedent in form executed said purported and pretended will he was not of sound and disposing mind. That at the time of signing said purported and pretended will he was unduly influenced, and was prejudiced against this contestant. That said instrument in writing was obtained and execution thereof procured by fraud and circumvention and undue influence practiced upon the deceased by his son Ulysses G. Swan, or some one in his behalf. That this contestant is informed and believes said instrument purporting to be the last will of said deceased was not executed in the manner and form required by law."

An answer was duly filed by the proponent to the objections of the contestant in which the objections were denied and in which answer the reasons why the contestant was not mentioned in the will, and that her omission therefrom was intentional on the part of the testator, are more fully set forth. A trial to the court without a jury resulted in findings of fact, conclusions of law, and judgment sustaining the will, and the contestant appeals.

The court, after making some formal findings, continued its findings thus:

"That at the time when said decedent executed the said paper as and for his last will and testament, to wit, the 2d day of March, 1914, he was of sound and disposing mind, and was not laboring under any duress, menace, fraud, or any undue influence, nor was he in any respect unduly or otherwise influenced in relation to the execution of said will by any person or persons whomsoever. That in and by the execution of said will there was no prejudice manifested or existing against said Maude A. Blackford, either by or on behalf of said decedent, or influenced thereto by any person."

After finding that the will was duly executed and witnessed as required by our statute the court further found:

"That said instrument in writing, to wit, said last will and testament, was not obtained, and the execution thereof was not procured by fraud or circumvention, or any undue influence practiced, or attempted to be practiced, upon the deceased by his son, Ulysses Grant Swan, or by any other person or persons in behalf of said Ulysses Grant Swan or otherwise."

The contestant assails the findings we have set forth above upon the ground that they are not supported by the evidence, and that they are against "the great preponderance and weight of the evidence."

The testator, at the time of his death, was eighty-four years of age, and at the time he made the will in question was eighty-three years old. He left surviving him his widow, one son (the proponent), the contestant (a daughter of a deceased son), W. Dee Stone (a grandson), a sister, and perhaps several other relatives. Excepting the proponent all the children of the deceased died before he did. The important questions to be determined are: (1) Was the testator of sound and disposing mind, that is, did he possess the required legal capacity to make a will and thereby dispose of his property at the time the will in question was made and published? and (2) was the said will "procured by fraud and circumvention and undue influence" as alleged by the contestant? As we view the evidence in the case the latter question presents no difficulty whatever, and therefore may be summarily determined. For that reason we will dispose of that question now.

The evidence wholly fails to show that the will in question was procured by undue influence, fraud or circumvention, or by unfair or illegal means employed by or on behalf of any one. On the contrary, it affirmatively appears, as far as the evidence discloses anything relating to that subject, that the testator was not unduly, or at all, influenced by any one in what he did respecting the making of the will. Contestant's objections to the finding of the court relating to that question must therefore fail.

Upon the other branch of the case, namely, the mental con-

dition and legal capacity of the deceased at the time the will in question was made, the evidence is quite voluminous. The undisputed facts are to the effect that at the time the will in question was made the deceased was eighty-three years of age; that he then was afflicted, and for a number of years had been suffering, with hardening of the arteries and with some disease of the kidneys, and by reason of that fact his physical health had for some time been failing and his mind was more or less affected, and at times he had spells of unconsciousness lasting several hours at a time; that the spells aforesaid usually occurred about a month apart, and at times a little oftener; that when the spells were over his mind usually was clear enough to transact, at least, ordinary business, and he continued to transact business, such as collecting his rents, which amounted to about $1,200 per month, and depositing the money in the bank up to about the time he made the will in question; that the terms of the will were written out in longhand informally by the testator himself, and he took the writing to the scrivener, whom he requested to put it in proper form in accordance with the directions in the informal writing, which was done; that the same scrivener had previously made at least three wills for the testator, and had transacted business for and with him for about twenty-five years; that as soon as the will was written out in typewriting, the testator called in two of his friends of about twenty-five years' standing, with both of whom he had transacted much business, and asked them to sign the will as witnesses, which they did; that the last will was made principally for the reason that in the will preceding the last one the testator had not provided for his wife in accordance with the provisions of our statute and he had been advised by a lawyer friend that that will was "illegal." In the last will, therefore, the wife was given her statutory share. The will was also changed in a few minor matters. Prior to the making of the will in question the testator had deeded a large portion of his real estate to the following named persons: On December 23, 1911, to Theo. L. Swan (daughter of the proponent) a certain parcel of ground of the value of $55,500; on March 31, 1911, to Gale Swan

(another daughter of proponent) a parcel of ground of the value $51,000; on December 23, 1911, to the proponent a parcel of ground of the value of $72,000; on February 14, 1913, to the contestant a parcel of ground of the value of $10,000; and on the same day to W. Dee Stone (one of the devisees in the will) a parcel of ground of the value of $4,000. The foregoing real estate was all situated in the business part of Salt Lake City. The testator, however, reserved to himself by proper writings all rents, issues, and profits of all the real estate deeded as aforesaid. In addition to the foregoing the deceased died seised of real estate which a real estate broker testified was worth over $150,000, all in Salt Lake City. He also died possessed of several thousand dollars worth of personal property. In the will all of the property owned by the deceased was devised and bequeathed as follows: (1) One-third of all the property to the widow; (2) $600 to the testator's grandson, W. Dee Stone, the same person to whom he had deeded $4,000 worth of real estate, to defray his expenses in completing his education; and (3) all the residue was devised and bequeathed to the proponent, and in case the wife should die before the testator, then the portion allotted to her was also given to the proponent. The testator had made other wills, two of which were made while an older son and a daughter were still living. Provision was therein made for those two. The will preceding the one in question was made after the death of those two, which was, however, changed for the reason before stated. In the last preceding will the wife was, however, given less than one-third of the testator's real estate, while to the proponent was given the whole residue, just as in the will in question. Counsel for the contestant, however, earnestly and with much force argue that the evidence leaves no room for doubt that the testator at the time he made the last will was afflicted with senile dementia, and that, for that reason, the will cannot be permitted to stand. When a will is made by a person who has reached the age of upwards of eighty years, and it is shown that the usual infirmities of old age, such as hardening of the arteries and consequent loss of memory, etc., have supervened,

and, in addition thereto, it is contended, as in this case, that the testator was afflicted with some form at least of senile dementia, the question of whether the testator possessed the necessary legal capacity to make a will at the time of its execution is never free from difficulty, and is nearly always shrouded in more or less doubt. The case at bar merely illustrates the general rule. In 1 Underhill on the Law of Wills, 165, the author says:

"The cases in which the advanced age of the testator has been urged as a circumstance impairing his capacity to make a will are extremely numerous. It is, moreover, in the highest degree probable that this will continue to be a mooted point and a fertile source of litigation because of the utter impossibility of formulating a rule which shall be universally applicable to the varying circumstances of the cases. It is safe to say that *old age alone, no matter how great, never did and cannot invalidate a will, if from all the evidence it appears that the testator had sufficient capacity.* Old age is a circumstance to be considered. But old age is never conclusive. The presumption of competency is not destroyed by an extremity of age, though it may be weakened where the testator is very old and other circumstances are proved; but taken alone it matters not that the testator was 100 years old at the time of the execution of the will. The question in every case is, Did the testator, no matter what his age, have sufficient mental capacity to recall to mind, to retain there and to understand the matter in hand, and did he comprehend the claims of those who were bound to him by nature?"

In Stewart, Legal Medicine, p. 368, the progressive character and effect of senile dementia from a legal point of view is well stated. In 2 Hamilton, Legal Medicine, 116, the question of old age and senile dementia is also discussed. Numerous cases are cited by the authors mentioned which it is not necessary to refer to here.

Having regard to the evidence of the two medical experts who testified on behalf of the contestant in this case and who gave their opinions respecting the mental condition and capacity of the testator, which opinions are based upon the whole evidence, we find that there is practically no difference between the opinions of those two witnesses and the statements of the authors to which we have referred. It is not practical, nor is it necessary, to refer to the evidence of the two experts in detail. Dr. W. Brown Ewing, after stating that, in his

opinion, the deceased was afflicted with senile dementia and, therefore, was of unsound mind when he made the·will in question, and after having been thoroughly cross-examined, nevertheless, finally concluded his evidence (quoting from the original bill of exceptions) as follows:

"Q. In answer to question No. 4 you said you would look upon the actions of such a person (a person with the symptoms described by the witnesses) with suspicion. I understand you to mean by that, Doctor, that that would be the extent of your objection to them (the actions of such person) ; that they would need to be scrutinized and they might be or might not be the act of a sane person? A. That was what I meant to imply there in my answer that he might do under the influence of others something right or something wrong. Q. But if there was no influence, no extraneous influence brought to bear upon him and he was in a condition to transact ordinary business you would still think that his mind was sufficiently clear so that he would know what he was doing? A. I say might do the right and might do the wrong. Q. He might know what he is doing and he might not. Is that what you mean? A. Yes."

While Dr. Beatty was quite pronounced in his opinion that the deceased was afflicted with senile dementia, yet he stated that if the attacks of unconsciousness, etc., which the witnesses testified the deceased was afflicted with, and which they fully described, were not due to a condition of senile dementia, then the deceased was not necessarily incapacitated from making a will. In that connection the doctor said:

"If those attacks were not due to a condition of senile dementia, I would say that during the intervals between the recurrence of these attacks, the subject might be competent to understand the surroundings and to transact his usual business. It depends on the cause of the attacks, which I stated could be senile dementia or the condition that is not attended with organic changes may be functional. If it were purely an auto-intoxication, it would be functional. If it were senile dementia it would be organic. If it were a mere functional disease resulting from auto-intoxication, there would be no reason why he would not transact his ordinary business."

Again, the fact that the deceased did continue to transact his business for at least several months after he made the will is not and cannot well be disputed. Moreover, he directed what he wanted done almost to the last and kept up correspondence with some of his relatives up to within a short time before his death. In that connection the author of Underhill on the Law of Wills, p. 164, says:

"The true object of the inquiry into lost memory is to ascertain how far this faculty of the understanding has lost its original strength and vigor *as regards those facts of the personal history of the testator, which enter into and form a part of the planning and execution of a rational, fair, and just testament*. If a memory for these is absent, it is immaterial how retentive the memory of the testator was as to other facts; while if this is shown to exist, his inability to recall other facts and circumstances, while always relevant, is of minor importance. The fact that an aged testator had, at a period not too remote from the execution of the will, attended to his business affairs is always material. It may be shown that he was active in business, that he made contracts, paid bills, received money, and attended to the details of his daily avocation."

Further, when the will was made the deceased selected his own witnesses, and he chose not only intelligent and reliable business men, but selected such as he had known and who had known him intimately for many years. Those witnesses, as well as the scrivener who, at the request of the deceased, prepared the will in its present form, were familiar with the attacks with which the deceased was afflicted and on several occasions were with him when he had such an attack. They were thoroughly familiar with his mental condition and unhesitatingly transacted business with him and knew that others did likewise without question or hesitation. None of those entertained any doubt respecting his mental capacity at the time the will was made. Many of his friends knew that his memory was failing. Indeed, all who knew and observed him saw that physically he was declining and that his once strong mind and intellect were slowly, but surely, becoming enfeebled. The evidence, however, shows that there were but few of his friends, if any, who, if they had been put to the test at the time the will was made, would have testified under

oath that the deceased, except when he had one of the spells, was not possessed of sufficient capacity to transact ordinary business or to dispose of his property in his own way. True, Dr. Beatty, indeed, both doctors, in effect, tell us that all that may have appeared to be true to those persons, and yet the deceased may have acted as a mere automaton, that is, that his actions were mechanical, the mere result of long-continued business habits rather than being prompted by sound judgment or an active intellect. But whether the conclusions of the doctors or those of the many other witnesses is the correct one is precisely what the district court was called on to try and determine. Whether the one or the other conclusion should prevail depended, if not entirely, nevertheless, to a large extent upon what weight or effect should be given to all of the evidence. That question was one exclusively for the trial court, and so long as there is some substantial evidence in support of the court's findings, that is, if the evidence is such where reasonable men could arrive at different conclusions, we are prohibited from interfering. That will contests under our Constitution and statutes are regarded as actions at law, and that the findings of the trial courts, upon questions of fact in case there is substantial evidence to support the findings, are conclusive upon us, was settled in the case of *Miller* v. *Livingstone*, 31 Utah, 417–439, 88 Pac. 338. It certainly cannot successfully be contended that there is no substantial evidence in support of the court's findings in this case.

Notwithstanding the Constitution of this state which limits this court to the determination of questions of law alone, where cases at law are appealed, and notwithstanding this provision of the Constitution is affirmed and fortified by one or more decisions rendered during nearly every term of this court since the Constitution was adopted, we are, nevertheless, compelled to consider the same question and reiterate the same fundamental rule at nearly every term of court. In most cases the question is raised in connection with other assignments of error. In the present case, however, the insufficiency of the evidence to sustain the findings of the trial court is practically the only ground upon which appellant seeks to

reverse the judgment. We do not understand, however, that appellant makes any point against the established rule above referred to or that the present case is not within the rule, but it is persistently and vigorously contended from the beginning to the end of appellant's argument that there is no substantial evidence in this case to justify the findings or to support the judgment. Especially is this true in the able and elaborate arguments made since the former opinions were rendered. In view of this fact the court deems it expedient to review more closely, and, to some extent, in greater detail, the evidence in support of the findings alleged to be erroneous. In doing so it is manifestly not the duty or the province of the court to go farther than to show that there is substantial evidence to uphold the findings, for, to go farther and undertake to compare and weigh the evidence would be to do the very thing which the Constitution and the former decisions of this court forbid.

In considering the evidence and its sufficiency it must not be overlooked that the functions and duties of subscribing witnesses to a will in this state, and perhaps in most of the states, are not alone to witness the signature of the testator and formal execution of the will, but they must, at the same time, pass upon the question of his sanity and testamentary capacity. The law of this state is not satisfied with the mere presumption of sanity. It requires affirmative proof of the fact. Comp. Laws 1907, section 3792, in part provides:

"If none of the subscribing witnesses reside in the county at the time appointed for proving the will, the court may admit the testimony of other witnesses *to prove the sanity of the testator* and the execution of the will." (Italics ours.)

The italicized words unequivocally imply that the subscribing witnesses must determine the sanity of the testator. Indeed, they would have no right to subscribe their names as witnesses to the will, unless they first satisfied themselves of his mental capacity to make it, and thereby dispose of his property. 40 Cyc. 1110. The witnesses in this case were selected by the testator himself. He had been intimately

acquainted with them for years. He had done business with them more or less during that time. He knew them, and they knew him; and, as heretofore stated, they knew something of his affliction which, at times, rendered him incapable of transacting business. F. E. Schoppe, one of the subscribing witnesses, had known the testator intimately for about thirty years, and saw him sign the will. He says:

"Mr. Swan's health was as good as it had been for several years. He appeared to know what he was doing. He was in sound mind, in his normal state of mental condition."

Further on, the witness, in speaking of the testator, said:

"He has been attending to his own business for the last ten years. I had quite a lot of deals with him, and he always attended to them himself."

A. S. Hamlin, the other subscribing witness, had known the testator for about twenty-five years prior to his death, and intimately for twenty years; did business for him; saw testator sign the will. This witness says:

"His state of health and his mind was good, so far as I know, that morning. He was able to do business; knew what he was doing. I believe he knew what he was engaged in. I am not in doubt about it. He was capable of doing business."

These excerpts from the testimony of the subscribing witnesses are taken from appellant's abstract. It is appellant's version of the testimony of these witnesses as given in support of the testamentary capacity of the testator at the time he executed the will. We feel justified in assuming that the testimony was fully as strong as appellant represents it to be. This testimony alone constitutes a prima facie case in favor of the testator's mental capacity. That, together with the other facts testified to by them as to the testator having declared the instrument to be his will, and the witnesses having signed their names in his presence, and in the presence of each other, constituted a prima facie case entitling the will to probate. These men, as subscribing witnesses, filled the requirements of the law in every particular. Their relations to the testator were such as to render them capable of judging of his mental capacity at the time of executing the will. It

was their duty to pass upon that qualification. They did pass upon it and found him mentally capable of executing a will and disposing of his property. It seems to us that a strict, fair, and honest application of the rule above referred to, having its foundation in the Constitution itself, and affirmed and reaffirmed over and over again by the decisions of this court, ought to end the controversy, even at this point, without further reference to the evidence in the case.

As before stated, all we have the power to do in a law case appealed to this court on a question of insufficiency of the evidence to sustain the verdict or a finding is to determine whether or not there is substantial evidence to sustain it. If so, the judgment must be affirmed; if not, it then becomes a question of law, and the court has power to reverse it. If, without further evidence, the court would have been justified in admitting the will to probate, it must be because there was sufficient evidence to sustain the judgment of the court. The competency of this evidence is not questioned. The materiality of the testimony is self-evident. The findings of the court are sustained by that testimony, and the testimony is substantial. What power has this court in such a case to disturb the findings, even if every member of the court, looking at the case from the standpoint of triers of fact, believed the findings should have been against the validity of the will? Each member of the court has sworn to obey and defend the Constitution of this state and discharge the duties of his office with fidelity. If, in a case as plain as the case at bar, we disregarded the limits imposed by the Constitution and the hitherto unbroken line of precedents established by the court, and assume to compare and weigh the evidence with a view of determining whether the trial court erred or not on a pure question of fact, it will amount to little less than a flagrant violation of the Constitution on the part of the court, and will tend to impair, if not absolutely destroy, the faith and confidence of the people of the commonwealth in the virtue and integrity of their judicial tribunals.

The testimony of the subscribing witnesses is not the only evidence in support of the findings of the court. We pur-

posely interjected at this point a few brief comments as to the effect of the evidence already considered for the purpose of emphasizing the scope and effect of the rule which we feel is absolutely binding upon the court. There is other testimony, however, in the record as conclusive as that of the subscribing witnesses upon the question of testamentary capacity. W. H. Cromer had known the defendant about twenty-six years. He was present when testator executed the will. He says:

"Don't think I ever saw his condition any better than on the day he signed the will; was in sound mental condition; knew what he was doing. He made the will out himself; a pencil sketch of it; brought it down, and I drew it up from that."

This witness was the scrivener who put the will into form, using as his guide the draft made by testator himself. This witness had made three other wills for the testator, one in 1903, before there was any question concerning his capacity to make a will. According to the testimony of this witness, in respect to all the wills drafted by him, both before and after the testator became afflicted, there was a tendency throughout to favor his sons and bequeath to them the bulk of his property. That partiality and discrimination complained of by appellant in respect to the present will as tending to show undue influence and a disordered mind was manifest to the same extent in wills executed before his mentality became a disputed question. The witness also gave testimony tending to show the positive, stubborn will of the testator right down to the execution of the last will.

But, as we have already intimated, enough has been said in this opinion to conclusively demonstrate the utter powerlessness of the court to do other than affirm the judgment. In arriving at this conclusion we have not, as will appear, brought in review the evidence relied on by appellant. We have been unable to see what effect it could possibly have upon the decision we feel bound to render. As before stated, if there is any substantial evidence to support the findings, our duty becomes fixed and absolute, no matter how much or what kind

of evidence there may be on the other side. For this reason, which to us is controlling, we have likewise declined to enter farther than we have the field of medical jurisprudence or to review and pass upon divers questions discussed in relation to the law of wills. Unless it be true that a layman is not competent to testify in a case of this kind and that only the testimony of medical experts should be considered—a proposition indefensible both in law and in the domain of reason—we have no doubt whatever as to the correctness of the conclusions which we have reached.

The trial court not having made a finding upon the question as to whether the contestant was intentionally omitted from the will in question, and the same not being an essential issue in proceedings to probate a will, we have not considered it necessary to pass upon that question, and have not done so in this opinion. The qualifications of the trial judge to hear the case were challenged at the trial. His sitting in the case is assigned as error. There is no doubt concerning his qualifications. The assignment should not prevail.

The foregoing opinion was written and concurred in by a majority of the court during the May term, 1917. Mr. Justice McCARTY, being unable to concur in the views of the majority, has recently served us with a dissenting opinion. We have given the same careful consideration, and find no reason to change or modify our views as heretofore expressed.

We hold tenaciously to the opinion that in law cases, in considering the sufficiency of the evidence to sustain the findings of the trial court, we are limited to the consideration merely as to whether or not there is substantial evidence to sustain the findings. If there is, we have no more power, in a case of that kind, to reverse the judgment of the trial court than the trial court would have to ignore or disregard a decision of this court in a matter within its jurisdiction. Whatever may be our inclination, in view of the extended review of the testimony made by our associate, to enter upon a more exhaustive examination ourselves as to the weight of the evidence, the credibility of the witnesses and the facts, we are restrained from doing so by the funda-

mental law of the state. As we view the dissenting opinion of Mr. Justice McCARTY, in the last analysis its validity must stand or fall upon the propositions as to whether or not the testimony of a layman in a case of this kind on the question of testamentary capacity can stand as against the testimony of a medical expert. If it can stand and may be considered by the court, then, in view of the evidence we have referred to, the position of the majority of the court is irrefragable. Believing it to be an elementary proposition that a layman who speaks from facts within his knowledge is competent to testify in cases of this kind and give his opinion, we did not heretofore cite authority in support of that proposition. In view, however, of the dissenting opinion, we now refer to the following cases cited in respondent's brief: *Kelly* v. *Perrault*, 5 Idaho, 221, 48 Pac. 45; *In re Kane's Estate*, 206 Pa. 204, 55 Atl. 917; *Wood* v. *Carpenter*, 166 Mo. 465, 66 S. W. 172; *Grant* v. *Stamler*, 68 N. J. Eq. 555, 59 Atl. 809; *Robison* v. *Jones*, 105 Md. 62, 65 Atl. 814; *Jones* v. *Collins*, 94 Md. 403, 51 Atl. 398; *Gesell* v. *Baugher*, 100 Md. 677, 60 Atl. 481; *Rutherford* v. *Morris*, 77 Ill. 397; *In re Lawrence's Will*, 48 App. Div. 83, 62 N. Y. Supp. 673; *In re Conaty's Will*, 26 Misc. Rep. 104, 56, N. Y. Supp. 854; *Artrip* v. *Rasnake*, 96 Va. 277, 31 S. E. 4; *In re Kiedaisch's Will*, 13 N. Y. Supp. 255; *In re Schmidt's Will*, 139 N. Y. Supp. 464; *Beverley* v. *Walden*, 20 Grat. (Va.) 147. The foregoing cases support the proposition that nonexpert witnesses are competent in cases of this kind, and many of them go so far as to hold that the testimony of witnesses who were intimately acquainted with the deceased in his lifetime, and familiar with his mental condition at the time when the instrument was executed, is entitled to greater weight than the testimony of medical experts who had no such acquaintance or knowledge of conditions.

Under the circumstances, and in view of the dissenting opinion, there is one further point that deserves a passing notice. Let us assume, as contended by appellant, that senile dementia deprives a person of testamentary capacity, the question is still open as to whether or not Mr. Swan, the testator in this case, was afflicted with that disease. The three wit-

nesses present when the will was executed, whose testimony we have quoted, say he was of sound mind and seemed to know what he was doing. If their testimony is true, then the medical experts were mistaken when they testified he had senile dementia. If he had senile dementia, and that disease deprived him of testamentary capacity, then the three witnesses referred to were mistaken when they said he knew what he was doing when he executed the will. The question thus presented was one for the trial court. The court found that he was of sound and disposing mind. The finding is sustained by substantial evidence.

The judgment of the trial court is affirmed; the estate of the testator to pay costs of the appeal.

FRICK, C. J. (concurring).

To my mind there are at least two reasons why the conclusion reached by Mr. Justice THURMAN is sound: (1) If at the trial of the case the contestant had objected to the competency of the testimony of the subscribing witnesses and to that of the scrivener and other witnesses produced by the proponent upon the question of the testator's mental capacity to make a will, and the court had sustained the objection, and had excluded the testimony, and the ruling were properly presented to us for review on appeal all would agree that we would be compelled to reverse the ruling as being contrary to the law which has been in force for centuries, that such testimony is competent on the question of mental capacity. The foregoing, therefore, conclusively establishes that the testimony of the lay witnesses who testified on behalf of the proponent was competent to show and establish the mental capacity of the testator to make a will. (2) If, after the foregoing testimony was all before the court, the contestant had moved for judgment disallowing the will upon the ground that there was no evidence showing mental capacity, or that the evidence, as a matter of law, was insufficient to establish that fact, and the court had granted the motion and the ruling were properly presented to this court on appeal, we would again be

required to reverse the ruling and judgment as contrary to the law as it has been known and administered in such cases for centuries.

There is, therefore, but one conclusion permissible, and that is that there was not only substantial evidence before the district court showing mental capacity of the testator, but there was ample evidence to sustain the will—that is, to admit it to probate. The mere fact, therefore, that the contestant thereafter assailed the mental capacity of the testator by expert evidence could not make that which was competent evidence incompetent. Nor does the fact that the testator's mental capacity was assailed on the ground of senile dementia change the situation. Senility may, and perhaps does, often produce mental incapacity. That may be conceded. Whether the disease in a particular case has reached the state of dementia, and has thus progressed so that it has destroyed mental capacity, is, however, a question of fact to be determined by the triers of the fact, and is not a question of law. The very most that can be claimed in this case by the contestant, therefore, is that the testimony of her expert witnesses entirely overcame the probative force and effect of the proponent's evidence on the question of mental capacity. Whether that was the effect of the expert evidence was, however, a question of fact to be determined by the court whose province it was to pass on the weight and effect of the evidence, and hence cannot be determined as a question of law by this court. What the contestant requests us to do is to declare as a matter of law that the evidence produced by the proponent on the question of mental capacity is without probative force or effect. That the law forbids.

There is, therefore, but one result permissible, and that is the one reached by Mr. Justice THURMAN.

CORFMAN, J., concurs. GIDEON, J., concurs in the order affirming the judgment.

McCARTY, J.

I dissent.    The important—the controlling—questions presented by the appeal are:    (1) Did the testator, Edward D. Swan, have, at the time of the making and the execution of the will in question, the requisite testamentary capacity to make a valid will?    (2) Was the signing of the will induced or procured by undue influence practiced on the deceased by his son Ulysses Grant Swan (usually called Grant Swan), or by some one in his behalf?    I shall review the evidence somewhat in detail, and then consider and briefly discuss these questions in the order in which they are stated:

There is no substantial conflict, as I view the record, in the evidence bearing on the question of whether the testator had, at the time of making the will, the mental—testamentary— capacity to make a valid will.    There is, however, some conflict in the inferences and conclusions deduced from the evidence regarding whether it proves or disproves the existence of certain facts sought to be established by it, but, as stated, there is no substantial conflict in the evidence itself as I read it.

Mr. Swan, the testator, at the time of his death, was, and for about twenty-five years had been, a resident of Salt Lake City.    For many years prior to coming to this city he was successfully engaged in the business of ranching and cattle raising in Montana.    The following excerpt from appellant's printed brief correctly describes and illustrates the kind and character of man he was, physically and mentally, as shown by all of the evidence on that point, until a few years before he died, namely:

"Mr. Swan was a remarkable man, large of stature, over six feet in height, weighing considerably upwards of 200 pounds.    He was frugal, economical, and saving, shrewd in business, sound in judgment, just in his dealings; his work was good, he was steady and determined in his purpose, not subject to being influenced, strong and vigorous, mentally independent and self-reliant, always acting upon his independent judgment and dictation.    He was of a jovial and pleasant disposition, fond of jokes, and a pleasant companion.    From time to time he made wise and advantageous investments in

real property in and about Salt Lake City, and made many improvements thereon. He rarely sold any of his real estate. He became worth at a very conservative estimate upwards of $350,000, principally represented by improved &ast; &ast; &ast; real estate in Salt Lake City.''

The record shows that Mr. Swan practically ceased doing business—making investments—a year or more before he signed the will in question. Grant Swan and A. E. H. Peterson collected the rents from his property for him. A. L. Hamlin, one of the subscribing witnesses to the will, and for many years an intimate and trusted friend of Mr. Swan, testified that:

''He (Mr. Swan) didn't have much to do in the last three years that I know of. &ast; &ast; &ast; I did practically all of his work (referring to repairs made on buildings, etc.) &ast; &ast; &ast; But you will understand there wasn't very much done in the last year and a half.''

Mr. Swan's wife, Ann Swan, age seventy-seven years, was, at the time of his death and for some considerable time prior thereto had been, in poor health. They had four children; three sons and a daughter. Nicholas, the oldest, died in 1881. His wife and Maude Swan, his only child, now Mrs. Blackford, the contestant and appellant herein, survive him. Esdras, the second son, married in 1883, and died in 1907. He had no children. Mr. Swan's daughter, Wilda Ellen Swan, married Leonard Stone in 1887, and died August 12, 1907. She had no children. Ulysses Grant Swan, hereinafter called Grant, the fourth and youngest child, and Blanche Swan, his wife, were married in 1886. They have two children (daughters), Theo and Wilda Gale Swan. Theo Swan married in 1912, and has since lived in Grand Rapids, Mich. Wilda Gale Swan, who is conceded to be an invalid, is unmarried. Blanche's mother died when Blanche was a child. Her father married Mr. Swan's sister. Blanche lived with her stepmother, to whom she was very much attached, from the time she was six years of age until she married Grant Swan. The only grandchildren Mr. Swan had were the three granddaughters mentioned. The record shows that Mr. Swan was

not only very much attached to his son Esdras, but that he had confidence in his judgment and ability to successfully transact business; that the death of Esdras had a lasting, sorrowful, sad, and depressing effect on his nervous system, from which he never fully recovered, and that this affliction was intensified and very much aggravated by the loss of his daughter in 1912. The evidence also shows that for twenty years prior to the death of his daughter Mr. Swan was afflicted with diabetes; that he also suffered much from the bite of a dog inflicted on his leg, and that soon after the death of his daughter there was a noticeable and marked change for the worse in his physical and, apparently, in his mental condition.

Mrs. Ada M. Surbaugh, a witness called by the contestant, testified:

"I have known Mr. Swan for about twenty-five years. My husband and he have been great friends. When he was in the city he would come in, at least once a week, into the store and rest. I noticed a great change in him after Esdras' death. Before that Mr. Swan was a jovial, pleasant man. After Esdras' death he seemed sober, sorrowful, when he came in, and we noticed a great difference. I noticed a further change after his daughter Wilda's death. He was very sorrowful; seemed absent when he talked. He would start to talk and wander away; forget his conversation." That she frequently met and spoke to him, but he failed to recognize her. That "he came into our store so often and didn't know me—it was so common I didn't notice it; went to his house once or twice during 1914. He didn't know me on those occasions. The last time I was passing by I stopped, and he was on the porch. I went up to him. He didn't look at me. I says, 'Pa, good morning.' He says, 'Why, why.' I said, 'It is Mrs. Surbaugh.' He said, 'Well.' I walked off and I left him and went into the room to see Mrs. Swan; felt kind of worried about it. I said, 'Mrs. Swan, what is the matter with Mr. Swan?· He hardly spoke to me.' 'Oh,' she says, 'he is going fast; he is losing his mind.' "

John Eslinger, a witness for contestant, testified:

That he had known Mr. Swan for about twenty-five years;

that as a real estate agent or dealer he had done business with him; that the last business he transacted with him was in 1902 or 1903; that their relations socially were very cordial, "were always very intimate—rather confidential"; that he discussed with him how he was going to leave his property; "said he was glad he had the amount to leave his children; wanted them to have it equally. I think that conversation was in my office, probably seven or eight or ten years ago. * * * When I first knew him he was a robust man; six feet high at least; quite a healthy man; was a man of his word; close in dealing, but very shrewd, and was a very nice appearing man. * * * He has not been active in the last three or four years; has been kind of on the down grade. * * * I knew his son Esdras. I remember when he died; noticed the change in Mr. Swan since his son's death. * * * The first I noticed peculiar with him has been as much as three years ago perhaps, maybe a little longer. I met him in front of my office * * * one day, and went up to him and * * * asked him how he was. He didn't know me. He said my face kind of looked familiar, but said, 'For the life of me I couldn't speak your name.' I told him, and he said, 'Oh, yes, yes, yes; I know you.' * * * I met him frequently on the street. I had to tell him who I was each time. The old man would go along looking kind of as if he was in a dream."

He further testified:

That on one occasion, and about the time the will in question was executed, he was passing Mr. Swan's residence, and noticed Mr. Swan sitting on the porch, and "stopped to have a little talk with him." That at first Mr. Swan did not know him, but when he told Mr. Swan who he was Mr. Swan answered: "Oh, yes, yes, yes; I know; yes." Mr. Swan's mind when he first met him on that occasion "was a blank or almost a blank." That they talked a little while and Mr. Swan said: "There is times * * * I find myself walking along the street and I don't know how I got there; then I pick up. It seems like things look natural to me."

On cross-examination he testified:

"The first time I noticed that he was off in his mind was when he didn't seem to remember my name. There was something wrong with him. He was a great man to tell jokes. I missed him from my office for a long time, and when I met him and said to him, 'Why don't you ever come around again?' he says, 'I couldn't find your office.'"

Mrs. Grant Swan (Blanche), proponent's wife, testified respecting Mr. Swan's physical and mental condition as follows:

"I was very intimately acquainted with Mr. Edward D. Swan. My visits have been as often as from once to three or four times a week. Previous to the last couple of years when father's [Mr. Swan's] leg became so bad, he came to our house quite frequently, probably once a month. I know of him being bitten by a dog some time ago. I don't think he was entirely well from that time on. I saw him more frequently during the years 1913, 1914, after Mrs. Stone [Mr. Swan's daughter] passed away. I remember when he had those spells of sickness that he suffered. As I remember they commenced about the time Mrs. Stone passed away. It is not very easy to explain them. He just didn't seem to know. It was not exactly a delirium. In an instant it would seem to be a delirium. * * * I remember on one or two occasions when he did talk, but as a rule he just didn't seem to know what he was doing. He would sit and usually, as I saw him, read something that he had in his pocket. * * * I have seen him take a postal card and seem to read it through, and read it over and over and over. He would seem to go right through it, and then go right back and go through it again; didn't seem to know what he was doing, but would walk around the house. He knew where he wanted to go, and in a measure could take care of himself, but just didn't know what he was doing in those periods."

On cross-examination she testified:

"I have tried to talk to him when he was in the condition I have described. * * * I don't remember just what I said, but it was futile every time. Sometimes he would look up,

but would look right away, and continue reading, or whatever he was doing.''

Mrs. James Howells, a witness called by the contestant, testified:

That she lived with and worked for Mrs. Ann Swan, ''first in September, 1911, for 7 months, until March, 1912; went back again in February, 1913, and worked until about the middle of April, 1913. * * * Mr. and Mrs. Swan were there practically all of the time. At times Mr. Swan did not act right, and would get up in the morning when I was preparing breakfast. He would make his toilet, then he would eat breakfast and go in and lay down. * * * He would come out again, make his toilet right over, and would say, 'May I have my breakfast?' I would say, 'You had your breakfast, Mr. Swan.' He would say, 'No, I haven't.' I would say, 'Yes, you have.' 'Well, I will go in and ask Mrs. Swan,' and she would say, 'Yes, Pa, you have had your breakfast.' Then he would lie down again and sometimes get worse. These attacks did not occur so often at first as they did at last. * * * When I was first there they occurred probably once a month. Later when I was there the second time he had these spells once or twice a week * * * and generally in the morning. * * * Once he asked [her] if they had a son named Grant Swan, asked his wife. She said, 'Yes, he lives up on ''N.'' street.' He didn't say anything except 'Oh!' or something like that.''

S. B. Westerfield, a witness called by the contestant, testified:

That he has known Mr. Swan since 1889; ''knew him well. He joined a lodge I belonged to back in those years. When I first knew him he was a man of fifty-three or fifty-five years of age, a substantial business man of good judgment, good ability, an old-fashioned business man. Have noticed considerable change in him the last few years. * * * I saw him most if not every time I came down. He and I lived on the same street. * * * He seemed to have considerable difficulty in expressing himself; kind of short on continuity of thought, etc., and recognition. I think I noticed it in the

first part of 1914. * * * I met him on Main street. * * * He was looking for the Deseret National Bank, State or Zion's Savings Bank (well-known business houses of long standing); that he was going in an opposite direction from the banks mentioned."

Continuing, the witness said:

"I naturally determined he was not quite right at the time."

Leonard Stone, a witness called by contestant, testified:

"I married Mr. Edward D. Swan's daughter, Wilda Swan. * * * She died the 25th of August, 1912. * * * Mr. Ed. Swan acted as administrator of the estate. Mr. N. J. Sheckell was his attorney. * * * Soon after my wife's death I lived with him and Mrs. Swan in the house all the time. * * * I slept in the room where his safe was. He came into that room in the middle of the night, and went and rattled the safe door, which woke me, and I said, 'What are you trying to do?' And he said, 'I am trying to get in the toilet.' * * * I heard him ask for his breakfast after having had it. * * * He would jump up [and say], 'Is breakfast ready?' start for the kitchen, and want to eat over again. Q. Would he ever ask about things that were familiar? A. Why, in the most pitiful manner. * * * One morning he ate his breakfast, * * * went to the window that was in the door (at the rear of the house), * * * and stood there a long time. We stood near him * * * as we didn't know what might happen. Finally he says, 'Whose back yard is that? * * * What nice new building is that out in that yard there?' We informed him that it was his back yard and his new automobile house that he had just built. * * * He used to get very pale in the face and blank in the eyes; very much so. * * * I remember when he was confined to his bed about a year ago. * * * He seemed to be dying just as fast as he could, seemed to be wasting away just as fast as he could. * * * I have heard him call Goshen down right there in church before the people would go out. He would say, 'You know that isn't true about a business matter you referred to;' called him right down in church before the congregation. * * *

I don't think there is any doubt but that Mr. Swan had uremic poisoning. * * * Uremic poisoning started in at about the time of my wife's death, about the time Es died. I was urging him to make a disposition of his affairs. * * * The only remark that I remember he made was, 'I have about made up my mind that the best way for a man to do with his affairs would be to just simply let them go,' and that they would be equitably arranged by the court.''

Eugene Bush, a civil engineer, was called by contestant, and testified:

That in 1914 he lived at Mr. Swan's home ''constantly in the latter part of February or the first of March until May 17th (will was executed March 2, 1914) ; was there nights and Sundays; part of the daytime and nights always, on week days. He was a very old man; * * * was stooped. He appeared to be weak physically. He carried on his daily work, such as eating, sleeping, smoking cigars, and occasionally walked to town and back. Other than that he seemed to have no interest in things. I accompanied him on his walk one or two times. He had one sick spell that lasted several days. It was severe. He had minor sick spells of the same class, I should judge. At each time he knew nothing or recognized no one from all appearances. That would apply to the members of his household. He was very forgetful at times. * * * At times he would talk disconnected. * * * I observed him crying at one time; was occasioned by somebody talking of some old war, some old Indian affair. * * * The crying continued for three to five minutes. * * * From all I observed while I was there, I would not consider Mr. Swan, on the 1st and 2d days of March, 1914, competent to transact business. While I was there the actions and movements of Mr. Swan were watched by other members of the family, as they didn't know when a spell of sickness would attack him; and also all his business transactions were watched carefully by Mr. Swan, Jr., Mr. Grant Swan.''

Joseph F. Simons, a witness for contestant, testified that about two or three years before the trial of the cause in the lower court, he presented to Mr. Swan, at his home, a bill

against an estate of which Mr. Swan was the administrator. The bill was for the publication of a notice in the probate proceedings concerning the estate, and had been O. K.'d by the attorney for the estate, and that Mr. Swan refused to accept the bill, and stated that he did not know who the attorney was. On cross-examination the witness testified:.

"Q. You concluded he didn't know anything about the bill? A. He said he didn't know the name of his attorney, and didn't comprehend the nature of the transaction. When I called his attention to the fact that N. J. Sheckell, his attorney, had O. K.'d it—the bill—he said he didn't know who Mr. Sheckell was."

Rev. Elmer Goshen, pastor of the Congregational Church in this city, and who had known Mr. Swan for fourteen or fifteen years, was called as a witness by contestant, and testified:

"When I first knew him he was an exceptional man, very strong character, physically and mentally exceptional; strong, resolute man. I knew him very well; I think four or five years—he attended my church constantly. * * * In the last three or four years he has been gradually weakening physically. The last year he showed a break. * * * I never saw him when his mind was a total eclipse. The times that I saw him, perhaps twice, when he was most incapaciated, he was suffering with what I would call a melancholia. * * * At times * * * I would find him in a condition of the depression melancholia early in 1914. * * * I don't know what his physical trouble was, I tried to get his mind away; tried to cheer him up getting him to think that he would be better. I remember one time when he talked confusedly, and couldn't connect his ideas. I said to some of the people, 'You must get him out of that, and suggest that you talk about things that happened years and years ago *to bring his mind back.*'"

On cross-examination he testified:

"He was physically ill; that affected his mentality and made him feel depressed. He * * * thought he was not going to live much longer; didn't seem to care much about it,

but you couldn't get him out of these feelings; that is, I couldn't.''

Charles H. Link, a witness called by the contestant, testified:

That he has known Mr. Swan from fifteen to eighteen years; that they were neighbors and lived close together on the same block; that ''when I first knew him he was * * * a very strong-willed man; a big strong man. I always considered him a very strong character, strictly honest, stand by his word, and carry out any contract he entered into; had some business dealing with him a good many years ago; met him frequently in the last ten years. Of late I have noticed a change in his manner. I should say it commenced two or three years back; noticed him weakening. His mind was not clear. The last year or so he seemed to be confused at times. His mind was weakening apparently. I think he knew me well. I can recall two or three times when he met me and didn't recognize me. * * * He had no trouble of recognizing me prior to three years ago.''

The deposition of Mary Bush was used in evidence, and was, so far as material here, as follows:

''Have lived in Salt Lake City twenty years; am * * * practicing nurse. * * * I knew Mr. Swan * * * five months, probably; went there January 5, 1914; left the latter part of May or the beginning of June. Mrs. Grant Swan got me to come and take care of the old folks. The first day after I got there Mr. Swan was not there until evening. The next morning he got up and was out of his mind. He would go around, and he was strange to me, and asked repeatedly the question who I was, and what I was there for. * * * Grandma told me that he was not quite right. * * * His business was loaning money for one thing. * * * I heard him talk about him loaning money and not remembering whether he had taken security. Most of the time he would remember when refreshed. I have known he didn't once or twice even after prompting and assistance * * * remember nothing unusual at the breakfast table or other meals, excepting as I said that he would cry. He did that quite frequently. The occasions when he would cry would be for

nothing particularly. He would be talking about something in the past. * * * Those crying occasions happened outside of the table once, or twice. * * * I remember probably three or four spells he had. * * * Sometimes he would be all right, and then again he was not. * * * On these occasions he would start on one subject and not conclude. He would start telling something, but would cry before he finished, and then start on something else when he got his nerves cooled down again. I think a guardian was mentioned once. I remember the conversation, but I can't just remember who was there. * * * I think it was Grandma Swan that started it. * * * Q. What would you say as to his capacity to fully call to his memory, without prompting his relations and property and condition of his business, that on the 1st or 2d day of March, 1914, or at any other time while you were there, * * * to have sufficient mind and memory to make a will? A. 'Well, I judge him incompetent because he couldn't remember from one day to the other.' "

On cross-examination the witness testified as follows:

"Q. You don't know what capacity it takes to make a will in the eyes of the law, do you? A. Well, I should judge it would take a man with his full faculty of mind; clear mind. One of my ideas would be that he would have to know what he was doing."

Counsel for proponent assail with much earnestness the evidence of Mrs. Bush, and insist that it is entitled to but little, if any, weight. They say:

"She talked of Mr. Swan being in doubt as to whether he had taken security for a loan. She is the only witness who speaks about Mr. Swan loaning money. * * * We do not have it anywhere else in the evidence."

Counsel are in error. Leonard Stone in his evidence, referring to a certain real estate transaction to which Mr. Swan was a party, says, referring to Mr. Swan, "When he did it I think he loaned him $7,000, to make the trade; but he took security for that $7,000, or, I think it occurred less than two years ago." Moreover, proponent in his petition alleges that Mr. Swan at the time of his death owned "certain mortgages,

cash on hand, notes and debts approximating $8,000.'' This allegation is not denied. Therefore the natural and fair inference is that the mortgages and notes represented money loaned by Mr. Swan.

Christine Peterson, a witness called by contestant, testified: ''Have lived at No. 2 Swan's Court a little over nine years. * * * About two years Mr. Swan would come for the rent on the 1st. That is when my rent was due. * * * Sometimes I would see him every week. * * * About two years ago I remember meeting Mr. Swan, and I said, 'How do you do, Mr. Swan?' and he said, 'I know your face, but I don't remember who you are.' I said, 'I am Mrs. Peterson;' and he said, 'Where do you live?' and I said, 'Oh, I live down in Swan's Court;' and he said, 'Where is that?' and I put up my hand and said, 'Oh, right down there.' 'Oh yes,' he said.'' That on another occasion when she called at his home to pay the rent Mr. and Mrs. Swan were sitting on the front porch; that she ''went up to the old gentleman and said, 'I came to pay my house rent.' Mr. Swan said, 'Where do you live?' I said, 'live down in Swan's Court.' 'Yes,' he said * * * _____. * * * He said, 'How much do you get for your furnished rooms?' I said, 'I charge $6 for one and $8 for the other.' When I said that he swore a little and said, 'Well you have a better income than I have, or you couldn't pay me $12 in house rent and get along.' * * * The old gentleman got up and went into the house. * * * I felt bad. * * * I guess she (Mrs. Swan) could see I felt bad, so she said, 'Don't give any notice to what he says; he has got it into his mind he is a poor man, and hasn't a dollar to his name.' ''

Mrs. Minnie Swan was called by contestant, and testified: ''I am the widow of Esdras Swan. * * * Before my husband's death my father-in-law was a large man, active and businesslike. * * * I went to live in Omaha in January, 1911. Up to that time I saw considerable of my father-in-law every year. After my husband's death Mr. Swan acted wonderfully grieved. I was here in November, 1913; don't think I was here more than a week. * * * Pa had failed;

changed very much to what I had seen him before. His
health had gone down, and he was very feeble, and he often
cried. That is something he didn't do in his well days.
* * * One morning, especially, I remember, Pa cried at
the breakfast table. He was not himself like he had been
before."

Respondent called T. R. Burton, James Jensen, John Ashby,
and John A. Eckman as witnesses.

Burton testified:

That he had known Mr. Swan "since down in the eighties";
that during the years 1912, 1913, and 1914, "met him very
frequently when he was down in the city, and sometimes met
him when he wasn't down; met him every day; sometimes
two or three days—maybe once in two or three days. * * *
He never failed to recognize me. Never see him but recognize
his acquaintances; intimate acquaintances. His mental and
general condition during those three years was good. * * ' *
Never did any work for him. All his real estate business was
done by somebody else."

James Jensen testified:

That he had known Mr. Swan since February, 1911; that
he was employed as a pharmacist, and that Mr. Swan "came
in to buy cigars. Sometimes two or three times a week, and
sometimes not so often. I served him part of the time. * * *
He seemed always to know just what he wanted."

John Ashby, a tenant of Mr. Swan, testified:

"Knew Mr. Swan about five years and a half. During 1913
and 1914 he used to come in perhaps on Monday morning and
in the middle of the week, about three times a week; Saturday
anyway. * * * I don't know that there was any time he
didn't know me. * * * He liked to relate stories of when
he was freighting up in Montana. * * * When he related
those Montana instances he was always calm and showed no
emotion." That he "generally attempted to make necessary
repairs" on the premises. "He talked intelligently with me;
seemed bright to me. * * * I never noticed that on any
of these occasions he did not know what he was doing."

John A. Eckman, a tenant of Mr. Swan, testified:

"I saw him (Mr. Swan) practically every day during the summer of 1914.   *   *   *   He appeared to me to be an intelligent business man.   *   *   *   Seemed alert in business matters."

Respondent called several other witnesses—acquaintances of Mr. Swan—who testified that during the years of 1913 and 1914 they met him at intervals varying from one to two weeks to once a month, and that he seemed to have possession of his faculties and to appreciate and realize what he was doing. Some of these witnesses met him in a casual way only, and others claimed they transacted business with him in a small way.

C. H. Dowse, a witness called by respondent, testified:

That he had "known Mr. Swan for 7 or 8 years. That the last three years I sometimes saw him every day; sometimes once a week or once in two or three weeks." That in August, 1913, he and Mr. Swan exchanged a farm that Mr. Swan had listed with him to sell three or four years before for certain improved property in Salt Lake City, known as the Mead Apartments. That "I got Mr. Swan and Mr. Mead together. Mr. Swan carried on the negotiations on the farm and Mr. Mead on the apartments. Mr. Swan did his own trading in the matter.   *   *   *   In my judgment he was able to transact business in the month of February up to the 1st of March to such an extent that he knew the nature and character of the business.   *   *   *   Mr. Swan cried in my place; don't remember just when it was; some time before he went away."

Regarding the deal referred to by Dowse, Grant Swan testified that he and his father "closed up this Mead deal." Dowse also testified that immediately after this deal was completed Grant Swan requested him "not to put through any more deals with his father."

The deposition of Mary Ann Stout, a sister of Mr. Swan, was put in evidence by respondent. In the deposition she says:

That during the last ten years she saw and talked with the deceased twice. Once in August, 1909, and in May, 1914.

"In the year 1914 I was at his home four weeks. * * * The first week I was at my brother's place in May, 1914. His mind wandered quite a little. After that, his mind became better, and he was as rational during the last three weeks of my visit at his place in May, 1914, as he ever was. * * * During the first week * * * several times his mind would wander off for a little while, and I am sure at such times he was lost; not in his right mind; did not know what was going on about him. * * * I talked with one of his soldier friends, whose name I cannot now recall, about my brother's mental condition during the first weeks I was at his place in 1914. I have no recollection of talking to any other person about his mental condition, and I am quite sure I did not."

A. T. Moon, a witness called by contestant, testified:

That he had known Mr. Swan well for about twenty years. That during a part of the time he was associated with him in mining business, and also transacted other business with him. That during the last three years he had noticed a marked change in his mental and physical condition. That there were times when he didn't seem to be in his right mind. That "he would go about apparently attending to affairs without knowing just what he was doing. * * * He would sometimes have a kind of dazed expression as though he didn't realize or sense what was going on. We would frequently walk down the street together—down Second South." That on one of these occasions they walked and talked "about matters" for several blocks, and that "I noticed that he didn't recognize me; didn't know who I was. * * * I know of his bidding on some property about January, 1914. I was acting for Mr. Derge, the seller. He came around and said we would have to let him off because it (the deal) would make feelings in the family; said if he went ahead and made this deal they might have a guardian appointed for him. * * * I have heard him tell stories of his younger days, frequently. It was more of late years that he was telling these stories. * * * He would shed tears. When he was telling stories he would get into the spirit of it and become very emotional."

A. F. H. Peterson was called as a witness by both contestant and respondent. The record shows:

That Peterson represented Mr. Swan in the real estate deal mentioned by Moon in his evidence, and that Mr. Swan authorized Peterson to bid $12,500 for the property. Regarding the transaction between him and Mr. Swan, relating to the deal, Peterson testified that Mr. Swan put up a check for ten per cent. of the amount of the bid. That "the check was handed to me several days before the sale. * * * I had the check from the 14th to the 20th. He came in on the 20th and asked me to cancel the check, and I did so. * * * He felt bad, and said that * * * Ma (Mrs. Swan) and Grant didn't want him to buy any property, and they had made the statement that they would have to appoint a guardian over him if he invested. * * * Tears came into his eyes, and he says, 'I am sorry that they feel that way about it; * * * to think that I am not allowed to do as I want to.' I take it it was one of his good days when he knew what he was talking about. As a rule he always understood what we were talking about. Sometimes he would have to have matters explained to him a little bit. * * * I think after things were thoroughly explained to him he was able to know and appreciate the character of the business he was transacting. * * * Sometimes it was necessary to go into explanations. * * * When discussing his property Mr. Swan wandered occasionally. * * * I remember an occasion when he didn't know property he owned. He could not remember what property it was. He said he didn't own any property on Sixth South. * * * Within the last two years I had to call his attention to the fact that he owned this strip of property on Sixth South street on two different occasions, and had to discuss the matter with him before he understood he did own it."

W. H. Cramer, one of the subscribing witnesses to the will, testified that, referring to the bid of $12,500 mentioned by Peterson, before the deal was called off, Mr. Swan stated to him that his bid on the property was $10,500 only. In less than a week Mr. Swan evidently had forgotten the amount of his bid as well as the amount of the deposit made by him.

The record shows that A. L. Hamlin, one of the subscribing witnesses to the will, and Mr. Swan were close intimate friends; that Hamlin did practically all of the carpenter work in the making of repairs on the buildings occupied by Mr. Swan's tenants. Hamlin testified:

"He relied a great deal on my judgment as to whether certain things should be done or not. * * * I knew that for the last two years Mr. Swan had had attacks. That for a day or hour perhaps his mind would be a blank; sit by himself in a chair. * * * Sometimes he would take a letter out of his pocket and read it; * * * would get up and walk about the house wherever he wanted to; * * * saw Mr. Swan many times at his home when he didn't know what he was doing; didn't know how to do anything. * * * Q. When he was in one of these attacks, he was physically capable of going around? A. Oh, yes; get up and go around; go where he pleased. Q. It is purely mental. The trouble was mental? A. That is all. * * * He was a very much changed man the last three years. * * * When he was in his right mind I think he was as capable the last three years as prior to that time. * * * I remember once he stated they (Mrs. Swan and Grant Swan) told him he was crazy." That on another occasion Mr. Swan said to him, referring to the transaction of January 14, 1914, mentioned by Moon and Peterson in their evidence, that his "folks didn't want him to buy any more property; couldn't tell how long he might live, and they didn't want any more property on their hands, unless it was absolutely paid for. * * * 'Well,' he said, when he made those remarks, 'the chances are they may think I will have to have a guardian if I can't know what I want to buy.' "

Two eminent physicians, Dr. Ewing and Dr. Beatty, were called by contestant, and each, in answer to hypothetical questions that reflected the evidence relied on to show that Mr. Swan did not have the requisite mental capacity to make and execute the will in question, stated that the facts and symptoms embraced in the questions unmistakably indicated that Mr. Swan at the time he made the will was afflicted with senile

dementia, and hence was of unsound mind. In their diagnosis of the nature of the infirmity or disease, they stated it as organic, continuous, and permanent, and not in any sense functional or intermittent. On this point Dr. Ewing testified as follows:

"As the the cause I would attribute it to a disease of the arteries coming on in old age, which is commonly spoken of as hardening of the arteries. The arteries in the brain, being the end arteries as we call it, when the artery becomes diseased, the size of the lumen of the artery is decreased, and consequently the blood supply is decreased and the cells of the brain are not supplied with sufficient blood to keep up the nutrition. Consequently the cells become atrophied and absorbed, and their places taken by a fibrous tissue and that decreases the size of the brain itself, and a nerve cell once destroyed never regenerates."

On cross-examination he testified:

"As I understand dementia it is a degeneration of the brain cells, and those of the cells that are once degenerated do not recover, but all cells are of course not degenerated at the same time, and until it reaches its final stage, the patient has some mentality of course. In the earlier stages, yes, in the latter extreme, no. He might be able to collect thoughts so as to write letters containing 150 words without any break in their connection and expression of his ideas. I don't think he could do that after it progresses for several years." "In case of senile dementia patients very frequently carry out the acts that they have been accustomed to do in an automatic sort of way, as signing their names for example, or doing other things that they have been accustomed to do for a long number of years, and not comprehend the act being performed. It is almost automatic, and these automatisms may be without distinct knowledge of the act performed."

Dr. Beatty's testimony was substantially the same as that given by Dr. Ewing on cross-examination. He made the following observations:

"I described senile dementia yesterday. It is a condition of the mind in which the individual suffers from loss of

memory, from loss of co-ordinated thought, lack of coherence at times, and inability to recognize acquaintances; places. Among other things that are given by authorities is the fact that— Where an individual has eaten his breakfast, and subsequent to that time prepares to eat another breakfast, having —laboring under the delusion he has not had his breakfast, is one of the characteristics of it.   There is usually a dullness of expression; is usually slovenly; careless in dress.''

The doctor further testified:

''From my personal observations of Mr. Swan in his lifetime I would not change in any respect the answers I have made to the questions just asked.   My personal observation of Mr. Swan would strengthen or verify the answers I have made to the questions propounded.''

On cross-examination:

''My observations of him were merely casual; I only saw him infrequently, but always noticed him.   He was rather a peculiar man; dressed in a slovenly manner; wore the same hat usually.   My recollection of him is a slovenly man; remember the picture of his face; the condition of senility. \* \* \* If I didn't know I would have taken him to be over eighty.   He was senile.   Senility is characterized by withering of the tissues in the face, wrinkles, a dullness of expression, bent condition ordinarily, lack of energetic motion.   I saw him probably several times in 1914 on the street.   I noticed the changes in him in the last two or three years.   I remember about the last few times I saw him. \* \* \* He was a very old man.   He was wrinkled, and had a drawn expression; a dullness of the eyes in the last.''

It will thus be observed that Dr. Beatty's judgment, or more correctly speaking, his convictions, respecting the nature of the infirmity or disease with which Mr. Swan was afflicted during the years 1913 and 1914, is based on what he personally knew and observed of the man during the period, as well as on the evidence in the case as reflected by the hypothetical questions propounded to him on that question.   The evidence of the physicians on this point, as I view the record, is undisputed.   In other words, there is no substantial conflict in the

evidence bearing on this question. In diagnosing diseases and mental infirmities the evidence of skilled physicians is entitled to and should be given considerable weight. In fact it is often the only character of evidence by which the nature of the disease and mental infirmities with which a person is afflicted can be determined.

In *Bever v. Spangler*, 93 Iowa, 576, 607, 61 N. W. 1072, 1081, the court says:

"But we find, in turning to the authorities on the question of senile dementia, written by men who have made a special study of the mind and its diseases, that they announce a rule in accord with the following quotation from Mandsley on Responsibility in Mental Diseases; 'He may sell his property and speak of it as his afterwards; ask the same question over and over again, forgetting that it has been asked and answered; not recognize one whom he has previously known well; inquire after the health of some one who has been dead for some time, or ask after the health of the person with whom he is talking, as if he were asking after it from some one else—and yet it may be proved by documents that he is all the while filling up and signing checks correctly, keeping his accounts accurately, and making no mistake in the management of his affairs.' The experts introduced by contestants testify to practically the same thing."

The court further observes:

"There are cases where expert testimony is of great value, and we are not prepared to say that this is not one of them. The books introduced in evidence establish that it is exceedingly difficult, if not impossible, for an ordinary, unprofessional witness to distinguish between symptoms indicative of the natural decline incident to old age and symptoms strongly suggesting the disease of senile dementia. On questions of this kind we must rely upon the judgment and opinions of experts, who are able to make proper distinctions, and to furnish us the rules by which we may differentiate the one case from the other."

In *Ewing v. Goode* (C. C.) 78 Fed. 444, the correct rule, I think, is well illustrated in the following language:

"In many cases, expert evidence, though all tending one way, is not conclusive upon the court and jury, but the latter, as men of affairs, may draw their own inferences from the facts, and accept or reject the statements of experts; but such cases are where the subject of discussion is on the border line between the domain of general and expert knowledge, as, for instance, where the value of land is involved, or where the value of professional services is in dispute. There the mode of

reaching conclusions from the facts when stated is not so different from the inferences of common knowledge that expert testimony can be anything more than a mere guide. But when a case concerns the highly specialized art of treating an eye for cataract, or for the mysterious and dread disease of glaucoma, with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury.''

F. E. Schoppe and A. L. Hamlin, the two subscribing witnesses to the will, and W. H. Cromer, who was present and saw them and Mr. Swan attach their signatures to the document, testified for the proponent. Schoppe testified:

''Mr. Swan's health was as good as it had been for several years. He appeared to know what he was doing. He was in sound mind and in his usual and normal state of health.''

Cromer, who had known Mr. Swan for twenty-six or twenty-seven years, testified:

''Don't think I ever saw his condition any better than on the day he signed the will; was in sound mental condition—knew what he was doing.''

Hamlin testified:

''His state of health and mind was good so far as I knew that morning. He was able to do business—knew what he was doing. I believe he knew what he was engaged in. I am not in doubt about it.   *   *   *   I don't think Mr. Swan was in one of his spells the day he signed his will. I think he was sound and healthy.''

It is claimed that the evidence of these witnesses shows that the testator was, at the time he signed the will, of sound mind, and that he had the requisite mental capacity to make a valid will. As I view the record there is no substantial conflict, in fact no conflict whatever, in this evidence and that given by other witnesses in the case on the question of whether Mr. Swan was afflicted with some kind of mental infirmity or disease. Not only the evidence of contestant's witnesses, but evidence given by proponent, Grant Swan, Hamlin, and Mrs. Stout, show such to be the case. In fact this is not, and cannot, in the face of the record, be denied.

Dr. Ewing and Dr. Beatty testified that they were of the opinion that the mental infirmity or disease with which the testator was afflicted was senile dementia. In fact Dr. Beatty, who was acquainted with Mr. Swan, and had seen him occasionally on the streets of Salt Lake City during the years 1913 and 1914, and who observed his appearance mentally and physically, was very pronounced in giving his testimony that the deceased was afflicted with senile dementia. And I submit there is not a scintilla of evidence in the record that disputes or tends to dispute Dr. Beatty's evidence, or that given by Dr. Ewing. I think it would be difficult to conceive of, or imagine, a case in which senile dementia could be more clearly and conclusively established than it is in the case at bar.

In view of the undisputed evidence respecting the nature of the infirmity or disease with which Mr. Swan was afflicted, the effect of the testimony of Cromer and the two subscribing witnesses on the point in question is, that notwithstanding Mr. Swan was suffering from senile dementia his health was, nevertheless, when he signed the will, "as good as it had been for several years"; that he "was in sound mental condition"; that he was "able to do business—knew what he was doing"; that "he was sound and healthy"; that for the last twenty-six or twenty-seven years he had not been in any better condition. In other words, this evidence, if accepted as true, when reduced to the last analysis, tends to show that senile dementia, instead of weakening, impairing, and ultimately destroying the mentality of aged people, who may be afflicted with the disease, has the opposite effect, and tends to invigorate, strengthen, and even restore health and energy that have been weakened by old age and impaired by mental and physical infirmities and disease. The only thing that can be claimed for their evidence on that point is that it tends to show that an enfeebled and decrepit person eighty-three years of age who is afflicted with senile dementia may, nevertheless, be "sound and healthy." It is suggested, however, that the testimony of these witnesses is in conflict with the evidence given by the physicians respecting the nature and character of the mental infirmity or disease with which Mr. Swan was

afflicted.  I submit that the evidence on this point, the ad-
mitted facts 'and the laws of nature, conclusively show that
these witnesses either gave testimony which they knew was
untrue or they were mistaken.  The evidence, without conflict,
shows that Mr. Swan was, and for many years had been,
afflicted with diabetes, and it is conceded that he had some
kind of mental disease, and that at the time he signed the
will, and for two months prior thereto, he was under the care
of a trained nurse, who was employed at his home to look after
and administer to his wants.  It is therefore established be-
yond controversy that he was not ''sound and healthy'' either
in body or mind.  The evidence of the physicians, which, as
stated, is not disputed, shows that the mental infirmity or
disease was senile dementia.  Therefore, whatever conflict
there is in the evidence of the three witnesses last mentioned
and that given by the physicians relates to the effect senile
dementia has on the mind of a person afflicted with it.  The
evidence of the physicians is that it is a species of insanity,
and that a person suffering with it is of unsound mind, and
the effect of the testimony of the witnesses Cromer, Schoppe,
and Hamlin is that senile dementia does not injuriously affect
the mind.

Aside from and independent of the testimony of the doctors
the only inference deducible from the record, as I view it, is,
that Mr. Swan, during the years 1913 and 1914, was of un-
sound mind.  He was eighty-three years of age when he exe-
cuted the will, very feeble, and had been rapidly failing be-
cause of old age and the infirmities with which he had been
afflicted for several years, and which were very pronounced
during the years 1912, 1913, and 1914.  After he signed the
will he gradually became weaker and more feeble and infirm,
and, on January 14, 1915, less than a year after the will was
signed, he died.  The evidence, without conflict shows that he
frequently, during that time, met friends and acquaintances
of long standing—business men and women—some of whom
he had business dealings with prior thereto, who spoke to him,
shook hands with him, and that he failed to recognize them,
and did not know them until they explained to him who they

were.  He would frequently pass along the street paying no attention to persons whom he met, and, as some of the witnesses said, "as though he were in a dream."  He was, on different occasions, unable to locate and find offices and well-known places of business in this city with which he had for years been familiar.  On one occasion he did not know who a well-known attorney was that had been in his employ much of the time attending to legal business for him.  When conversing he would frequently be unable to connect his ideas, would change from one subject to another and talk confusedly.  On numerous occasions, when talking to friends and members of his family, he would, without any apparent reason, shed tears and cry.  During this time, when he was stricken with what are referred to in the evidence as "spells," his mind, for several hours at a time, was a blank, and he did not recognize any one —not even members of his family.  These spells, so called, were not, so far as the record discloses, accompanied by any physical pain.  In fact, the only inference deducible from the evidence on that point is that he did not suffer or experience any bodily pain whatever on those occasions.  On one occasion he inquired to whom the back yard of his home, and a new garage that he had recently constructed, belonged, and, as I have pointed out, the undisputed evidence shows that he was unable to remember real estate transactions to which he was a party, involving upward of $10,000, and would forget about real estate he had purchased—forget that he owned it.  On one occasion during the time (6 days) he had a real estate deal pending he forgot the amount ($12,500) he had bid for the property.

I think it may be fairly inferred from the record that Mrs. Swan and Grant Swan regarded him as being of unsound mind prior to and at the time he signed the will.  Mrs. Surbaugh testified that she met Mr. Swan at his home in 1914, and that he did not recognize her, and that Mrs. Swan said to her (referring to Mr. Swan) : "He is going fast; he is losing his mind."  Grant Swan, about a month before the will was signed, requested Dowse and Peterson "not to put through any more deals with his father."  This, under the circum-

stances, was a wise and commendable thing to do.    The reason, however, that he gave for taking this course, and for the objections made by himself and mother to Mr. Swan's closing the deal in which he had authorized Peterson to bid $12,500 for certain property hereinbefore mentioned, namely that they did not desire him to go into debt, is, I think, in view of all the facts and circumstances shown by the undisputed evidence in the case, a mere subterfuge.    Hamlin, Peterson, and Moon each testified that Mr. Swan expressed to him some fear or apprehension that in case he should close the deal referred to, or continue to deal in buying and selling real estate, Mrs. Swan and his son Grant would commence proceedings to have a guardian appointed to look after him and take charge of his property.    Grant Swan denied that there was any reason or foundation whatever for such belief on the part of his father. I think it therefore clearly appears that Mr. Swan was laboring under a delusion that such a thing might, and probably would, occur, unless he complied with their wishes and desires in that regard.    These circumstances, considered in connection with the delusion which the evidence tends to show he was under at least a part of this period of time that he was a ''poor man'' and did not have ''a dollar to his name,'' together with the numerous other facts and circumstances established by the evidence, I think clearly shows that his mind was at least partially dethroned.    The evidence, considered as a whole, including that given by the doctors, I think, clearly shows that Mr. Swan did not have the requisite mentality or capacity to make a will.

The testimony of Cromer where he says, ''Don't think I ever saw his condition better than on the day he signed the will,'' the evidence of Hamlin where he says, ''I think he was sound and healthy,'' and that given by Schoppe that ''Mr. Swan's health was as good as it had been for several years,'' is in conflict with the conceded facts.    The laws of nature refute Cromer's testimony on the point in question and conclusively established the impossibility of its being true.    He testified that he had known Mr. Swan for twenty-six or twenty-seven years, and, quoting, ''Saw Mr. Swan nearly every day

during the time I knew him when he was in the city.  \*  \*  \*
In 1913 I think Mr. Swan came to my office two or three
times a week, that is, when he wasn't sick," and that he fre-
quently talked and conversed with him.   He therefore knew
that this once powerful and rugged man physically and
mentally, who, because of old age and physical and mental in-
firmity, had become so enfeebled and infirm that he, figura-
tively speaking, had one foot in the grave, was not in the same
condition, either physically or mentally, that he was twenty-
six or twenty-seven years prior thereto when he was in the
prime of life.   Cromer's testimony on this point is, in the
opinion of the writer, sufficient to discredit his entire evidence.
It ought not to be considered for any purpose except where
it is corroborated by the evidence of other witnesses.   I am
not unmindful of the rule that in law cases the credibility of
witnesses and the weight of evidence is for the trial court to
determine.   But where the record shows, as it does in the case
at bar, that a witness intentionally and deliberately made mis-
leading and untrue statements respecting a material and im-
portant fact in the case, this court has not only the constitu-
tional power to reject the evidence of such witness, wherein it
is not corroborated by credible evidence, as unworthy of belief,
but the writer is of the opinion that it ought not hesitate so
to do, especially where, as here, the entire testimony of the
witness on controverted questions shows, so far as it is pos-
sible for a record to reflect the mental attitude of a shrewd
and adroit witness, that he was willing, so far as he was able
to do so without subjecting himself to criminal prosecution,
to supply any evidence that might be deemed necessary to
uphold the validity of the will and preclude the contestant
from sharing in decedent's estate.

Reference is made to Cromer's testimony respecting other
wills drawn by him for Mr. Swan, and also his evidence with
reference to a corporation that Mr. Swan had in contempla-
tion and consulted him about in 1902.   He testified regarding
the corporation as follows:

"Mr. Swan intended to incorporate for 100,000 [shares]
at $1 each.  \*  \*  \*   The way he wanted the corporation to

run was to give all the stock away and leave himself nothing. * * * That is the way he wanted the corporation made. That is what he was planning to do, but didn't do it. He was to have enough shares to be one of the directors. I think 500, * * * 45,000 of it would go to Esdras and 45,000 shares to Grant.''

He did not keep a memorandum of what was said by him and Mr. Swan on that occasion. He nevertheless testified to the minutest details of the proposed corporation as the same was outlined and planned by Mr. Swan. He testified that he had drawn four wills for Mr. Swan; the first in 1903, the second in 1907, and the third in 1913, and the fourth, the will under consideration, March 2, 1914. The will of 1913 possesses the same infirmities, as I read the record, as the will under consideration, therefore nothing more need be said concerning it. Moreover, Mr. Swan in that will practically disinherited his faithful, devoted, aged, infirm, and enfeebled wife who had shared with him the struggles, hardships, and privations incident to pioneer ranch life, and assisted in accumulating the money with which the property—assets of the estate—was purchased, and who remained by his side, cared for and comforted him in his declining years when they both were stricken with sorrow because of the death of their son Esdras and that of their only daughter, Wilda, and later on when he was sorely afflicted and stricken with physical ailments and a mental infirmity or disease. Grant Swan, referring to that will, testified in part as follows:

''Well, I don't know how it was brought about when Exhibit 1 was written that I got practically everything and mother a mere pittance.''

Keeping in mind the rugged honesty of Mr. Swan and his inherent keen sense of justice that impelled him to meet and fully discharge every moral and legal obligation that characterized his entire life until he became infirm and enfeebled by old age and stricken with mental and physical ailments and disease, I know of no theory that finds support in the evidence, and certainly none has been suggested, upon which the unnatural and inhuman features of that will can be explained or

accounted for except on the theory that at the time he made it he was of unsound mind or a victim of undue influence of the most reprehensible and wicked character.

Cromer, in testifying concerning the will of 1903, gave, or purported to give, every detail of the transaction and the amount bequeathed to each. devisee and legatee named in the will. On cross-examination he said:

"I have no memorandum of that will. Well it is as plain to me today as that day. * * * I have got brains, and they are clear."

He testified to the contents of the next will—the will of 1907—from memory only and purported to give practically every detail of that transaction, the changes made in the distribution of property from what it was in the will of 1903, the amount bequeathed to each devisee and legatee, of whom there were several who were not named in the first will. While his testimony, in view that he had drawn, so he claimed, a great many wills for other people, purports to reflect a remarkable, an extraordinary, and phenomenally retentive memory, it, nevertheless, might be entitled to some weight were it not for his evidence respecting the mental and physical condition of Mr. Swan when he signed the will in question, which the record shows was not and could not be true, and that he knew it was untrue. Furthermore, he was unable to remember whether he read the will in the case at bar at the time it was presented to Schoppe and Hamlin for their signatures as witnesses. On that point he testified as follows:

"I think I read the will to them right there, but wouldn't be positive. * * * I am almost positive I read it."

Schoppe and Hamlin each testified that the will was not read on that occasion. It will thus be observed that while the details of similar transactions that took place eight, twelve and thirteen years before were as fresh in his mind as on the day they occurred he was unable to remember circumstances and occurrences of no less importance that transpired only a year before. I have reviewed his testimony somewhat in detail respecting the foregoing matters because it is referred to as tending to support the claim made by proponent that

Mr. Swan, long before his mentality and physical strength became weakened by old age and mental and physical infirmities, had in mind making substantially the same disposition—distribution—of his property that he finally did make of it; and for the further purpose of showing that his testimony as given on these matters, when considered in connection with his evidence respecting the physical and mental condition of Mr. Swan when he signed the will in question, ought to be rejected as unworthy of belief, and should not be considered for any purpose except where corroborated by other evidence.

Assuming, for the purpose of argument, that Cromer's testimony regarding these matters is true, it in no sense tends to show that Mr. Swan, on any of those occasions or at all during that period of time, signified an intention on his part to discriminate between his granddaughters in the final distribution of his property. John N. Eslinger, an old friend of Mr. Swan's, and a disinterested witness, testified that about ten years before the will in question was signed Mr. Swan stated to him "that he was going to leave his property to his children equally." Leonard Stone testified that seven years before the will was executed Mr. Swan stated to him: "I have about made up my mind that the best way for a man to do with his affairs would be to just simply to let them go," and that "they would be equitably arranged by the court." The evidence, without conflict, shows that Mr. Swan was very fond of his granddaughter, contestant herein, and that he was very much attached to her little son Kenneth. Hamlin, one of proponent's principal witnesses, testified on that point as follows:

"I have heard him talk about Mrs. Blackford and her little son Kenneth. He was very fond of Kenneth, and fond of his granddaughter."

Leonard Stone, Mr. Swan's son-in-law, testified that "Mr. Swan was simply carried off his feet about the boy." The record contains other evidence of the same import.

Mr. Swan, on March 31, 1911, and before his condition physically or mentally became serious and alarming, conveyed by deed to his granddaughter Wilda Gale Swan, Grant Swan's

invalid daughter, improved real estate of the value of $51,000 situated on Main Street and in the business center of this city. Mr. Swan's act by thus giving his afflicted grand-daughter a preference over his other heirs by providing for her material wants and necessities before he made provisions for the final distribution of his property was, under the circumstances, commendable and praiseworthy in the highest degree, and was what might be expected of an honest, upright, just, and fair-minded person having a high sense of honor, such as the record shows Mr. Swan to have been. There is nothing in the record that tends in the remotest degree to show that Mr. Swan, after having provided for his invalid granddaughter, was, or had cause to be, more concerned in the welfare of Theo Swan than in the well-being of his other granddaughter contestant herein, in the distribution of the balance of his estate. It, however, as I have pointed out, shows to the contrary.

On December 23, 1911, Mr. Swan conveyed by deed to Theo Swan improved real property of the value of $55,500. At the same time he conveyed to Grant Swan improved real estate of the value of $72,000. On February 14, 1913, Mr. Swan deeded to Maude S. Blackford, contestant, improved real estate of the value of $10,000. At the time the will was signed Grant Swan and his two daughters had received from Mr. Swan real property representing in value substantially one-half of his estate as it was valued before and at the time the conveyances mentioned were made. And the will provides that he shall receive substantially two-thirds of the remainder of Mr. Swan's property. The record shows that Grant Swan was his mother's favorite. Mr. Swan, before his mind became enfeebled and beclouded with old age and impaired by disease, evidently knew or had good reason to believe that Grant would eventually get all of his mothers' property and her interest in the estate. The record also shows that Mrs. Ann Swan executed a will prepared by Cromer in which Grant was the sole and only devisee; that she subsequently conveyed to Grant by deed prepared by Cromer the property covered by the will. Grant Swan and his two daughters therefore will, if the will

in question shall be upheld, get substantially the entire Swan estate valued at more than $350,000. It is almost unbelievable that an upright, just, fair, and impartial man, such as the record shows Mr. Swan to have been, would, while in his right mind and free from undue influence make such an unequal, unjust, and unnatural disposition of his property.

Schouler on Wills, section 238, says:

"Gross and unaccountable inequalities in the disposition of a will will require in general some satisfactory evidence, that it was the free and deliberate offspring of a rational, self-poised and clearly disposing mind; and when such evidence is wanting, the will should be set aside."

Again, in the same section:

If "the instrument discloses on its face a manifestly unjust, unnatural, and partial scheme of distribution, and more especially one which favors those having free access to the testator and full opportunity for fraud or overbearing influence, to the exclusion of those who had not, the general repugnance felt by mankind to wills harsh and unnatural may well resolve all final doubts and condemn it."

While the rule is well established, and almost universally recognized and followed by the courts, that an unjust and unnatural disposition made by a testator of his estate does not, standing alone, establish the testator's lack of testamentary capacity, the rule is also equally well established that when there is other evidence, as in the case at bar, of mental incapacity, an unjust and unnatural disposition is a circumstance which, when considered in connection with such other evidence, may tend to show testamentary incapacity. *In re Williams' Estate*, 52 Mont. 192, 156 Pac. 1087, Ann. Cas. 1917E, 126. In that case the court, in the course of a well-considered opinion, says:

"Upon the record we say that the will undertook to make a most unnatural disposition of the property, and evidence of such fact is always admissible as a circumstance to be considered with other evidence, as tending to show an unbalanced mind or a mind easily susceptible to undue influence."

Applying the foregoing recognized and well-established rule to the undisputed facts in the case at bar, which establish conclusively that Mr. Swan, for more than a year prior to the

time he signed the will in question, was afflicted with a mental infirmity or disease, diagnosed and pronounced by the eminent physicians mentioned, whose evidence is not disputed, as senile dementia, the unjust and unnatural disposition Mr. Swan made of his property is a circumstance tending to show testamentary incapacity on his part when he signed the will.

Counsel for proponent, in their printed brief, remark:

"Nor can it be said that this is an unjust will.  *  *  * Grant stayed with his father after the others were married. It does not appear  *  *  *  how much property was acquired relatively by Grant's assistance and what claims might naturally result therefrom in Grant's favor.  *  *  *  We may assume rightfully that a large proportion of the property so acquired was by Grant's assistance."

The record shows conclusively that Grant was not, because of any assistance he may have rendered his father in accumulating the property in question, entitled to any preference whatever over the other heirs in the distribution of the estate. His testimony shows this.   He testified in part as follows:

"I was on the ranch a good part of the time up to eight years ago.   I was in California five years.  *  *  *  Father generally did business his own way.   I was never closely connected with his real estate business until I started to collect the rent.  *  *  *  I think I started in September, or October, 1912.  *  *  *  One year before my brother's death father had $6,000 or $7,000 of my money to invest.  *  *  * Father bought property for me with the $6,000 or $7,000 refered to.   Before I got 5 per cent. for collecting rents father didn't wholly support my family.   He did in part.  *  *  * Father sent Theo (Grant's daughter) to Vassar at his own expense."

And again he said: "We all lived out of the same pot." Eslinger testified that on several occasions Mr. Swan stated to him that "Grant had no business capacity"; that he started him and Esdras in the cattle business; that Grant "fell down" and Esdras succeeded in the business.   The only inference deducible from the record as it now stands is that Grant,

independent of the real property conveyed to him and his two daughters, received more assistance from his father than both Nicholas and Esdras received. There is, therefore, no basis for the contention that Grant Swan, from either a moral or equitable point of view, is entitled to any special consideration in the distribution of his father's estate.

I am also of the opinion that the only inference deducible from the evidence is that the will in question is the result of undue influence exerted over the testator by Grant Swan and his wife, Blanche Swan. The record shows, so far as it is possible for a record to reflect intellectuality, deportment, address, refinement, and womanly sympathy, kindness, and tact, that Blanche Swan was, and is, in these respects, an extraordinary woman. The evidence shows that for several years prior to the making of the will and during the time that Mr. Swan because of his feeble condition brought on by old age and physical and mental infirmities, needed some person of strong character with a kind and sympathetic nature to occasionally talk to him, cheer him up, and divert his mind and thoughts from subjects that he was prone to discuss and talk about, and which seemed to have a deleterious and depressing effect upon him both mentally and physically, Blanche was ever ready to, and on many occasions did, proffer her good services to cheer him up by talking to him and entertaining him. The evidence shows that the services thus rendered were not wholly gratuitous. Mr. Swan was, at the time they were rendered, and for several years prior thereto had been, contributing liberally to the support and maintenance of Grant Swan's family. Grant so testified. He also testified that his father furnished the money with which to send his daughter Theo away to school. In 1911 and 1912 the members of Mr. Swan's household conceived the idea of having him go over the history of his life and have Blanche act as the scribe or amanuensis to write down the events as they were related by Mr. Swan. Certain evenings of each week were devoted to these family gatherings. In January, 1914, Blanche arranged with Mrs. Mary Bush, a trained nurse, to go to the Swan home, look after and care for the old people,

Mr. Swan and his wife, Ann Swan. By these and many other acts of kindnesses of which these aged people were the recipients Blanche was soon able to wield a great influence over Mr. Swan. Mr. Stone, who, after his wife died in 1912, was a member of Mr. Swan's household, testified on this point in part as follows:

"When she and Mr. Swan were together he always seemed to be better, I don't know, a better spirit in the atmosphere. She used to cut his hair, and they seemed to have a pretty good time—seemed to have a real good time together."

The record shows that Blanche, during 1913 and 1914, occasionally accompanied him to church, and Mr. Swan confided to her his desires and wishes regarding certain matters that he withheld from the members of his own household. I think it may be fairly inferred from the evidence that Blanche had greater influence with and control over Mr. Swan during the last two or three years of his life than parents are ordinarily able to exercise over their children. Grant Swan testified that after he became his father's trusted agent and collected rents for him, "I think I was close to my father socially and in a business way." In fact I think the evidence shows that his father became subservient to his will. He testified that his father contemplated attending the G. A. R. reunion in 1912, but in obedience to his wishes his father remained at home and did not attend. He admitted that on two occasions his father was in the act of purchasing real estate, and at his request his father called off the deals. As I have stated, Mr. Swan, at the time he signed the will, had figuratively speaking, one foot in the grave and the mentality of a child only.

The record, as I read it, shows that this aged, infirm, enfeebled, and decrepit man, afflicted as he was by physical and mental ailments and diseases that were gradually sapping away his weakened and nearly exhausted physical strength and mental power, was thus dominated and controlled by two influences. One influence was exerted by Blanche Swan, which, because of the constant attention she gave him in his nearly helpless condition the last two or three years of his

life, her ministrations to his wants and her many acts of kind-
ness of which he was the recipient (all of which, in and of
themselves, were commendable and praiseworthy in the high-
est degree), created in his enfeebled mind a sense of obligation
and feelings of gratitude that enabled her, no doubt, to pro-
cure anything from him she wanted by the mere asking. The
other influence was exerted by Grant (evidently the only other
person to whom Mr. Swan felt he could depend on to look
after and take care of him and his property), this latter in-
fluence dominated Mr. Swan through fear, real or imaginary,
that unless he did as directed by Grant a guardian would be
appointed to take charge of him and his property. Taking
into consideration all of the facts and circumstances as shown
by the evidence bearing on the question of his mental and
physical condition, his natural gratitude to Blanche, his fear
of Grant and the specter, the delusion he was under that a
guardian might be appointed over him unless he yielded to
and complied with Grant's wishes, in connection with the
inequitable, unjust, and, I might add, unnatural distribution
he made of his property, I submit the conclusion is irrisistible
that the will was either the result of an unsound mind or
undue influence.

In conclusion will say that I am not unmindful of the legal
right of aged people, as well as those in the prime of life, who
are of sound and disposing minds, to make such lawful dis-
position of their property, either by deed or will, as they may
deem proper, and when the transactions are voluntary on
their part the courts have no right to interfere. While it is
important that this right should be recognized and upheld, the
same as other legal rights of the individual, it is equally im-
portant that the insane, feeble minded, and those whose minds
—intellects—are enfeebled and weakened by disease, old age,
or other causes, should be protected, and that no rule should
be adopted or recognized that would tend to make them, be-
cause of their misfortunes, the legitimate prey and the victims
of designing and unscrupulous individuals who, by the exer-
cise of undue influence, or under the guise and pretense of

honest business methods, seek to fleece and rob them of their property or succeed to and get control of their estates.

For the reasons stated, I am confirmed in my opinion that the cause should be reversed, with directions to the trial court to set aside the order—judgment—admitting the will to probate, and grant a new trial.